MJL:JJD
F.#2007R00069

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - -X

UNITED STATES OF AMERICA

    - against -

FRANK WILSON,
    also known as "Big Banana,"
    "Frankie B" and "Los,"
CARLOS LUGO,
    also known as
    "Ricardo Campana-Herrera,"
RENARD HOLDER,
    also known as "Von" and
    "Bananalito,"
HAYWOOD MITCHELL,
    also known as "Beano" and
    "Queen B,"
LORENZO WARREN,
    also known as "Lo,"
MELVIN TUCKER,
    also known as "Tuck,"
DARYL GRICE,
    also known as "Nick Nack,"
DENISE NEWCOMBE,
MARIE BLORE,
JAMES ARENA,
CASANDRA MAXWELL,
    also known as "KK,"
ASHANTI HARRELL,
    also known as "Footie,"
LEONARD MCCLOUD and
DARYNELL BODDIE.

        Defendants.

AND THE ELEVEN PREMISES KNOWN,
DESCRIBED AND DEFINED ON
EXHIBIT A ATTACHED HERETO

- - - - - - - - - - - - - -X

**07-0562M**

TO BE FILED UNDER SEAL

COMPLAINT AND AFFIDAVIT IN
SUPPORT OF APPLICATION
FOR ARREST WARRANTS AND
SEARCH WARRANTS

(T. 21, U.S.C., §§ 846 and
841(a)(1); and T. 18,
U.S.C., §§ 924(c) and 1956)

EASTERN DISTRICT OF NEW YORK, SS:

ANTHONY GARIFO, being duly sworn, deposes and says that he is a Special Agent with the Drug Enforcement Administration ("DEA"), duly appointed according to law and acting as such.

Upon information and belief, in or about and between April 2006 and May 2007, both dates being approximate and inclusive, within the Eastern District of New York and elsewhere, the defendants FRANK WILSON, also known as "Big Banana," and "Frankie B" and "Los,", CARLOS LUGO, also known as "Ricardo Campana-Herrera," RENARD HOLDER, also known as "Von" and "Bananalito," HAYWOOD MITCHELL, also known as "Beano" and "Queen B," LORENZO WARREN, also known as "Lo," MELVIN TUCKER, also known as "Tuck," DARYL GRICE, also known as "Nick Nack," DENISE NEWCOMBE, MARIE BLORE, JAMES ARENA, CASANDRA MAXWELL, also known as "KK," ASHANTI HARRELL, also known as "Footie," LEONARD MCCLOUD and DARYNELL BODDIE, together with others, did knowingly and intentionally conspire to distribute and possess with intent to distribute a substance containing cocaine base, a Schedule II controlled substance, in an amount of 50 grams or more.

(Title 21, United States Code, Sections 846 and 841(a)(1)).

Further, upon information and belief there is probable cause to believe that there will be kept and concealed at the eleven premises known, described and defined on Exhibit A hereto,

2

SUBJECT PREMISES #1, SUBJECT PREMISES #2, SUBJECT PREMISES #3, SUBJECT PREMISES #4, SUBJECT PREMISES #5, SUBJECT PREMISES #6, SUBJECT PREMISES #7, SUBJECT PREMISES #8, SUBJECT PREMISES #9, SUBJECT PREMISES #10 and SUBJECT PREMISES #11 (collectively, the "SUBJECT PREMISES"), within the Eastern District of New York, certain property, namely the items set forth on Exhibit B hereto, all of which constitute evidence, fruits and instrumentalities of violations of Title 21, United States Code, Sections 841(a)(1) and 846 and Title 18, United States Code Sections 924(c) and 1956. The items to be seized include any of the above items that are maintained within other closed or locked containers, including safes and other containers that may be further secured by key locks (or combination locks) of various kinds.

The source of your deponent's information and the grounds for his belief are as follows:[1]

## I. INTRODUCTION:

1. I have been a Special Agent with the DEA for approximately 16 years. I am currently assigned to the New York Field Division, Long Island District Office. During my tenure with the DEA, I have participated in numerous narcotics investigations, during the course of which I have conducted

---

[1] Because the purpose of this Affidavit is solely to set forth probable cause to arrest the DEFENDANTS, as defined below, and to search the SUBJECT PREMISES, I not have set forth all facts concerning this investigation of which I am aware.

physical and wire surveillance, executed search warrants, and reviewed and analyzed numerous taped conversations and records of drug traffickers. Through my training, education and experience -- which has included debriefing numerous cooperating drug traffickers, conducting numerous searches of locations where drugs and money have been found, and conducting surveillance on numerous occasions of individuals engaged in drug trafficking -- I have become familiar with the manner in which illegal drugs are imported and distributed, the method of payment for such drugs, and the efforts of persons involved in such activity to avoid detection by law enforcement.

2. I have personally participated in the investigation of the offenses referred to above, and from my personal participation in this investigation, including my review of line sheets from a court-authorized wire interception, and from reports made to me by other Special Agents of the DEA, local police departments, confidential sources and from reports of physical surveillance, I am familiar with the facts and circumstances of this investigation. Except where otherwise noted, the information set forth in this Affidavit has been provided to me by police officers, DEA Special Agents or other law enforcement officers assigned to the DEA or confidential sources.

3. In my role as a DEA Special Agent, I am the case agent in the investigation of a crack cocaine manufacture, distribution, and conspiracy organization led by WILSON, which has been committing the above offenses for more than a decade according to DEA and Suffolk County Police Department intelligence information (the "WILSON ORGANIZATION"), as set forth more fully below.

## II. INVESTIGATION OF THE WILSON ORGANIZATION:

### A. The WILSON ORGANIZATION

4. The Wyandanch, New York area has historically been the location of significant narcotics activity for many years. As discussed below, the defendant FRANK WILSON has been identified as the leader of the WILSON ORGANIZATION, currently one of the largest cocaine and crack cocaine distribution operations in Wyandanch, New York and the surrounding areas.

5. During the course of this investigation, law enforcement personnel have determined that WILSON is involved in essentially every aspect of the operation of the WILSON ORGANIZATION. Particularly, WILSON, together with associates: (a) travels to the Bronx, New York, where he purchases powder cocaine from a source of supply, who has been identified as the defendant CARLOS LUGO; (b) transports the powder cocaine to the Wyandanch area; (c) distributes portions of the powder cocaine to other narcotics dealers; (d) manufactures, or "cooks," the rest

of the powder cocaine into cocaine base, commonly known as "crack"; (e) distributes the cocaine base to other narcotics dealers; and (f) supplies multiple "crack houses," including SUBJECT PREMISES #5 and SUBJECT PREMISES #7, with crack cocaine for sale to other dealers and crack users.

6. As a result of this investigation, including information provided by the confidential sources and wire interceptions, your deponent and other agents have learned that the WILSON ORGANIZATION is supplied with cocaine by the defendant CARLOS LUGO, a source of supply in the Bronx, New York. Further, through physical surveillance and monitoring of wire interceptions, law enforcement agents have learned that WILSON, RENARD HOLDER, HAYWOOD MITCHELL and LORENZO WARREN have all traveled to the Bronx to purchase cocaine from LUGO.

7. Since the initiation of the wire interception on February 26, 2007, law enforcement officers have identified at least ten trips by members of the WILSON ORGANIZATION to the Bronx, including trips by WILSON, which, based on intercepted wire communications, are believed to have been made in order to purchase cocaine from LUGO.

8. As set forth more fully below, the evidence developed during this investigation, including evidence from confidential sources, physical surveillance and wire interceptions, reveals that WILSON is assisted by several

6

defendants in the operation of the WILSON ORGANIZATION and these defendants serve various roles within the WILSON ORGANIZATION, including facilitating financial transactions and manufacturing, or "cooking," and subsequent distribution of cocaine base. The defendants who assist in the operation of the WILSON ORGANIZATION are MELVIN TUCKER, DARYL GRICE, CASANDRA MAXWELL, MARIE BLORE, JAMES ARENA and DENISE NEWCOMBE.

9. Further, as set forth more fully below, the evidence developed during this investigation, including evidence from confidential sources, physical surveillance and wire interceptions, reveals that the WILSON ORGANIZATION resells distribution quantities of cocaine base to other narcotics traffickers in Wyandanch and the surrounding areas, including ASHANTI HARRELL, DARYNELL BODDIE and LEONARD MCCLOUD.

**B.    The Confidential Sources**

10. Confidential sources have provided a significant amount of information regarding the operation of the WILSON ORGANIZATION. Specifically, more than 20 different confidential sources, identified herein as "CS-1" through "CS-25" respectively, have identified WILSON as the leader of the WILSON ORGANIZATION. Additionally, these confidential sources have identified many of the other defendants as either members or customers of the WILSON ORGANIZATION.

11.  The confidential sources are individuals who have been arrested for various state offenses, including numerous narcotics-related offenses.  The confidential sources' knowledge of the activities of the WILSON ORGANIZATION comes from personal dealings with WILSON and other members of the WILSON ORGANIZATION, that collectively involve hundreds of purchases of narcotics, primarily cocaine base and powder cocaine.[2]  More particularly, in a number of cases, the confidential sources were arrested for narcotics-related offenses and admitted to having purchased the cocaine base that provided the basis for the state charges from either WILSON or other members of the WILSON ORGANIZATION, including the following examples:

a.  On or about January 11, 2007, CS-11 was arrested by the Suffolk County Police Department ("SCPD") for possession of crack cocaine.  CS-11 stated that he/she purchased the crack cocaine from a certain third-party, who had obtained it from WILSON.

b.  On or about January 17, 2007, CS-4 was arrested by SCPD for possession of crack cocaine.  CS-4 stated that he/she purchased the crack cocaine at SUBJECT PREMISES #9 from the defendant CASANDRA MAXWELL.

---

[2]  The aforementioned purchases of narcotics were not done under the supervision of law enforcement officers.

c. On or about January 18, 2007, CS-1 was arrested by SCPD for possession of crack cocaine. CS-1 stated that he/she purchased the crack cocaine at SUBJECT PREMISES #9 from MAXWELL.

d. On or about January 31, 2007, CS-13 was arrested by SCPD for possession of crack cocaine. CS-13 stated that he/she purchased the crack cocaine from the defendant RENARD HOLDER through a certain third-party.

e. On or about March 10, 2007, CS-25 was arrested by SCPD for unlicensed operation of a motor vehicle. CS-25 stated that he/she had purchased crack cocaine from the defendant DENISE NEWCOMBE and WILSON at SUBJECT PREMISES #5 that same day.

## C. The Title III Interceptions

12. On February 23, 2007, United States District Court Judge Arthur D. Spatt authorized for thirty (30) days the interception of wire communications occurring to and from MOBILE TELEPHONE NUMBER (631) 918-1058, BEARING INTERNATIONAL MOBILE SUBSCRIBER IDENTITY ("IMSI") NUMBER 316010155558804, SUBSCRIBED TO IN THE NAME OF MARY JONES,[3] 1845 STRAIGHT PATH, LINDENHURST, NEW YORK (the "SUBJECT TELEPHONE"). Interception began on February 26, 2007. On March 27, 2007, United States District

---

[3] To date, law enforcement officers have not been able to identify an individual by the name of Mary Jones with that address. In fact, the address, 1845 Straight Path, Lindenhurst, New York is the address of a Sprint-Nextel retail store.

Judge Sandra J. Feuerstein authorized for thirty (30) additional days the continued interception of wire communications occurring to and from the SUBJECT TELEPHONE. Again, on April 25, 2007, United States District Judge Arthur D. Spatt authorized continued interception of wire communications occurring to and from the SUBJECT PHONE for an additional thirty (30) day period.

13. Subsequent monitoring of the intercepted wire communications has confirmed that (a) WILSON is using the SUBJECT TELEPHONE, and (b) WILSON is using the SUBJECT TELEPHONE in furtherance of his narcotics distribution activity and to contact members and customers of his organization. Additionally, the investigation has determined that FRANK WILSON, also known as "Big Banana," and "Frankie B" and "Los,", CARLOS LUGO, also known as "Ricardo Campana-Herrera," RENARD HOLDER, also known as "Von" and "Bananalito," HAYWOOD MITCHELL, also known as "Beano" and "Queen B," LORENZO WARREN, also known as "Lo," MELVIN TUCKER, also known as "Tuck," DARYL GRICE, also known as "Nick Nack," DENISE NEWCOMBE, MARIE BLORE, JAMES ARENA, CASANDRA MAXWELL, also known as "KK," ASHANTI HARRELL, also known as "Footie," LEONARD MCCLOUD and DARYNELL BODDIE (collectively, the "DEFENDANTS") have been identified as either members of the WILSON ORGANIZATION or independent drug dealers supplied with cocaine and/or cocaine base by the WILSON ORGANIZATION. A number of relevant intercepted calls from the SUBJECT TELEPHONE are set forth below.

## D. Other Sources of Information

14.   In addition to information gleaned from the confidential sources and wiretaps referred to above, the investigation has involved physical surveillance and the review of documents, including real property records, vehicle registration records, banking records and telephone toll and subscriber records.  My knowledge of the facts set forth below is based upon all of these things, as well as discussions with other law enforcement personnel involved in the investigation.  Because the purpose of this Affidavit is limited to setting forth probable cause to arrest the defendants, I have not set forth every fact of which I am aware.  Indeed, this Affidavit contains only a portion of the relevant facts of which I am aware.  Except as otherwise noted, your deponent has not differentiated between information about which he has personal knowledge and information he received from other law enforcement sources.  Among the sources of information relied on herein, your deponent has summarized certain portions of audio taped conversations that were intercepted during the court-authorized wire surveillances. I have not summarized every pertinent intercepted call. Moreover, as to the conversations summarized, the summaries are preliminary, since they are often based on contemporaneous notes made by monitors of the wire surveillance and not on verbatim transcripts.  All conversations set forth below are in part and

11

in substance only.[4]

15. Unless otherwise indicated, voice identifications in this investigation were made through name and voice identifications made by the agents monitoring the wiretaps. Accordingly, monitors identified each interceptee through the interceptee's own identification of him or herself by name, as well as the phone number used to make the call, subscriber information for that phone and voice identification by other law enforcement personnel who were familiar with the interceptee's voice.

## III. PROBABLE CAUSE TO ARREST THE DEFENDANTS:

### A. FRANK WILSON, also known as "Banana" and "Frankie B"

16. As set forth above, more than twenty different confidential sources, several of whom are referred to herein, and other intelligence information from federal and local law enforcement have identified WILSON as the leader of the WILSON ORGANIZATION. The confidential sources' knowledge comes from personal dealings with WILSON and other members of the WILSON ORGANIZATION.

---

[4] As noted in the text, I have included descriptions of interceptions derived from court-authorized electronic surveillance pursuant to Title 18, United States Code, Section 2517(2) which permits disclosure whenever "appropriate to the performance of official duties." Because this Affidavit will be disclosed to counsel for the defendants, it also serves as notice, pursuant to Title 18, United States Code, Section 2518(9), that the interceptions from electronic surveillance may be used at a detention hearing.

17.  Specifically, confidential sources have stated that WILSON and other members of his organization purchase powder cocaine in the Bronx, New York, bring it back to the Wyandanch area and cook the powder cocaine into cocaine base for resale. Further, the confidential sources state that the WILSON ORGANIZATION is engaged in the resale of both (a) wholesale quantities of cocaine and cocaine base to large and mid-sized narcotics distributors; and (b) retail quantities of cocaine base to street-level narcotics dealers and narcotics users.

18.  For example, CS-6 informed law enforcement personnel that WILSON travels to the Bronx, New York twice a week to obtain between 8 and 12 ounces of cocaine and returns to the Wyandanch area to "cook it up."  CS-6's knowledge was based on the fact that he/she had personally accompanied WILSON on such narcotics purchases.

19.  Likewise, CS-12 informed law enforcement personnel that he/she has accompanied WILSON to the Bronx to purchase cocaine on at least six different occasions.  CS-12 estimated that WILSON made such trips three to four times a week and estimated the packages contained approximately one kilogram of powder cocaine at a time.  Further, CS-12 stated that WILSON carried a handgun in an ankle holster when they traveled to the Bronx to obtain the cocaine.

20.  Similarly, CS-24 informed law enforcement

personnel that he/she has accompanied WILSON into "the city" to purchase cocaine approximately four times. CS-24 indicated that, on one such trip, WILSON brought $30,000 in cash with him. CS-24 was aware of the amount because he/she helped WILSON count the money prior to the trip.

21. As set forth throughout this Affidavit, the wire intercepts from the SUBJECT TELEPHONE, in addition to the information provided by the confidential sources and physical surveillance, has confirmed that WILSON and the WILSON ORGANIZATION are supplied with cocaine by CARLOS LUGO, who is located in the Bronx, New York. Further, that evidence demonstrates that WILSON supplies members of the WILSON ORGANIZATION and other narcotics distributors with both powder cocaine and cocaine base.

22. Since the interception of wire communications from the SUBJECT TELEPHONE began on February 26, 2007, law enforcement officers have intercepted more than 2,500 pertinent telephone calls between WILSON and members of the WILSON ORGANIZATION and/or customers.[5] A significant number of those pertinent telephone calls were made between WILSON and the other DEFENDANTS and a number of them are discussed and/or summarized below. These telephone calls, together with the information provided by

_____

[5] As of May 16, 2007, at approximately 12:00 a.m., 2,579 pertinent telephone calls had been intercepted.

the confidential sources, surveillances and other evidence, constitute the probable cause to arrest WILSON and the other the DEFENDANTS.

**B.   CARLOS LUGO, also known as "Ricardo Campana-Herrera"**

23.   As set forth above, numerous confidential sources, including CS-6, CS-12 and CS-24, have informed law enforcement that the WILSON ORGANIZATION purchases cocaine in the Bronx, New York.   Based on this investigation, including wire intercepts and physical surveillance, law enforcement has determined that the defendant CARLOS LUGO is a source of supply for the WILSON ORGANIZATION.

24.   Law enforcement officers have intercepted 422 telephone calls between LUGO and WILSON using the SUBJECT TELEPHONE.[6]  Based on their training and experience, law enforcement officers believe many of those telephone calls relate to narcotics transactions, including the following examples:

a.   On March 1, 2007, monitoring agents intercepted an outgoing call from WILSON to LUGO.   The following is a transcript of the relevant portion of the conversation over the SUBJECT TELEPHONE:

---

[6]  Throughout this Affidavit, the estimated numbers of intercepted calls between the SUBJECT TELEPHONE (WILSON) and the other DEFENDANTS are approximate as of May 16, 2007 and include both completed and attempted telephone calls.

```
WILSON:    YO, I'LL EAT WHAT I LOST, I'LL EAT THAT...BUT WHAT
           YOU SHORTED ME, I NEED THAT.

LUGO:      PAPA, I DON'T SHORT YOU NOTHING.....I SAY UM 434
           PLUS THAT IS 12 I GIVE YOU EVERYTHING THERE...I
           DON'T SHORT ONE...NOTHING....

WILSON:    I DON'T LIE, I WON'T LIE...I'M NOT CHEAP...I'M NOT
           NO TACANO.........I'M TELLIN' YOU, YOU DID MAN, I
           KNOW FOR A FACT, ME AND MY BROTHER DID IT
           TOGETHER, I KNOW WHAT IT WAS.

LUGO:      WHAT YOU SAY...(INAUDIBLE)...FOR YOU WHAT YOU SAY?

WILSON:    HOLD ON ONE SECOND, I'LL TELL YOU RIGHT NOW.

LUGO:      YOU 434 PLUS 12.
```

It is the opinion of the monitoring agents, based upon their training and experience and the context of this conversation, that WILSON is complaining to LUGO that he received less cocaine than WILSON paid for during their prior narcotics transaction and that WILSON wanted LUGO to make up the difference.  In sum and substance, LUGO tells WILSON that he provided WILSON with the correct amount of cocaine ("Papa, I don't short you nothing...").  Additionally, WILSON references that he and his "brother did it together," which is a reference to HOLDER, who is believed to be WILSON's half-brother.

   b.  On March 12, 2007, monitoring agents intercepted an incoming call from LUGO to WILSON.  The following is a transcript of the relevant portion of the conversation over the SUBJECT TELEPHONE:

```
WILSON:    YO, WHAT UP?
```

16

```
LUGO:      WHAT'S GOOD, LOS?

WILSON:    CHILLING.  WHAT'S UP WITH YOU?

LUGO:      EVERYTHING ALRIGHT?  EVERTHING GOOD OVER THERE?

WILSON:    YEAH, I JUST BEEN CHILLING.  A LITTLE SLOW THAT'S
           ALL. RELAXING, I'LL PROBABLY COME SEE YOU TOMORROW
           NIGHT.

LUGO:      ALRIGHT.  YO, LOS, I'M A TRY TO FIND A NEW HOUSE
           YOU KNOW SOMETHING HAPPENED....YOU KNOW I GOT
           ROBBED AGAIN THEY..... 27 KILOS, MAN.
```

It is the opinion of the monitoring agents, based upon their training and experience and the context of this conversation and others, that LUGO informed WILSON that he was recently robbed of 27 kilograms of cocaine.

        c.  On March 15, 2007, monitoring agents intercepted an incoming call from LUGO to WILSON.  The following is a transcript of the relevant portion of the conversation over the SUBJECT TELEPHONE:

```
WILSON:    YO, YO.

LUGO:      WHAT'S GOOD, LOS?

WILSON:    YOU READY?

LUGO:      TWENTY SEVEN.

WILSON:    CONIO (SPANISH - DAMN)

LUGO:      DEFINITELY MAN, TWENTY SEVEN.

WILSON:    NO WAY.

LUGO:      RIGHT NOW I'M GOOD FOR TWENTY-FIVE, TWENTY-FIVE.
           RIGHT NOW I'LL GET SOME

WILSON:    ALRIGHT, ITS TOO LATE, TOMORROW IS ALRIGHT,
```

17

TOMORROW IS GOOD, OR YOU WANT ME TO GO TONIGHT

LUGO:     I DON'T KNOW, CALL ME MAN, YOU KNOW THE PRICE, DEFINITELY.

WILSON:   ALRIGHT, I'LL SEE YOU TOMORROW, NOT TONIGHT.

It is the opinion of the monitoring agents, based upon their training and experience and the context of this conversation and others that LUGO initially tells WILSON that the price of cocaine is $27.00 per gram.  WILSON says, "No way."  LUGO counters with a price of $25.00 per gram, which WILSON accepts.  WILSON and LUGO then agree to conduct a narcotics transaction on the following day, March 16, 2007.

        d.  On March 31, 2007, monitoring agents intercepted two incoming calls from LUGO to WILSON.  During the first call, LUGO states "TELL YOUR PEOPLE NEW JOB, MEAT, 28 [PAUSE] STREET."  It is the opinion of the monitoring agents, based on their training and experience, that LUGO is telling WILSON that he has a new shipment of cocaine, a "new job," and that WILSON can purchase the cocaine for $28,000 per kilogram, or $28.00 per gram.  LUGO attempts to communicate the price of the cocaine in code by saying "street" after "28."  It is the opinion of the monitoring agents, based on their training and experience, that narcotics traffickers frequently disguise their conversations by using code and that a frequent code is using street numbers.  Shortly thereafter, LUGO called WILSON again and

18

the following is a transcript of the relevant portion of the
conversation over the SUBJECT TELEPHONE:

> WILSON: WHAT'S UP MAN?
>
> LUGO: TELL YOUR BROTHER HE NEED TO CALL ME PLEASE.
>
> WILSON: CALL HIS PHONE.
>
> LUGO: I CALL HIM BOY HE DON'T [IA] THE PHONE.
>
> WILSON: AGH HE WORKING.
>
> LUGO: WHAT HAPPEN?
>
> WILSON: HE WORKING, DOING CONSTRUCTION ON FIXING HIS HOUSE.
>
> LUGO: ALRIGHT, I GOING TO GET SOME BUT IT'S GOING TO BE TWO SIX. YOU WANT SOME?
>
> WILSON: DON'T TALK TO ME. I TOLD YOU ALREADY MAN.
>
> LUGO: DO YOU WANT TO COME IN YES OR NO? BECAUSE MY PEOPLE DON'T WANT TO I DON'T DO NOTHING.
>
> WILSON: DIDN'T I ASK YOU NOT TO TALK TO ME PLEASE? REMEMBER WHAT I TOLD YOU?
>
> LUGO: YOU DON'T WANT TO COME IN NOW RIGHT?
>
> WILSON: CARLOS DO YOU UNDERSTAND ME? I SAID DO NOT TALK TO ME.
>
> LUGO: ALRIGHT, NO PROBLEM.

It is the opinion of the monitoring agents, based on their
training and experience, that LUGO and WILSON are having a
conversation regarding the price of a kilogram of cocaine.
Additionally, LUGO asks WILSON to have his "brother," the
defendant RENARD HOLDER, call him. When LUGO says, "its gonna be
two six, you want some," he is referring to the cost of a

19

kilogram or gram of cocaine, $26,000 per kilogram or $26 per gram, and he asks WILSON whether he wants to purchase any cocaine.  The call also illustrates WILSON's displeasure with LUGO when he (LUGO) talks numbers and specifics on the phone.

25.   On April 18, 2007, monitoring agents intercepted a series of conversations between LUGO and WILSON, wherein it became apparent that LUGO had traveled to Wyandanch in order to meet with WILSON. At approximately 6:44 p.m., law enforcement officers observed a red Dodge Caravan with New Jersey license plate UVZ-84B (the "Caravan") arrive at WILSON's residence, SUBJECT PREMISES #1.  Approximately twenty-five minutes later, the Caravan was observed at a restaurant on Straight Path, where WILSON was observed meeting with one of the occupants of the van. After leaving the restaurant, law enforcement officers continued physical surveillance on the Caravan and followed it back to SUBJECT PREMISES #1.  About ten minutes later, the Caravan left SUBJECT PREMISES #1 and drove to the Long Island Expressway and headed westbound.

26.   A police officer with the SCPD identified the Caravan, which was traveling in excess of 70 miles per hour, in violation of the speed limit, and conducted a vehicle stop of the Caravan.  LUGO, who was in the front passenger seat of the Caravan, produced identification in the name "Ricardo Campana-

Herrera."[7]  During the traffic stop, monitoring agents dialed the telephone number associated with a telephone used by LUGO to contact WILSON and the SCPD Officer was able to hear the telephone ringing during the traffic stop.

### C.  RENARD HOLDER, also known as "Von" and "Bananalito"

27.  On January 31, 2007, CS-13 was interviewed by law enforcement officers.  CS-13 identified the defendant RENARD HOLDER, who he/she knew as "Von," as his/her source of supply of crack cocaine.  CS-13 stated that HOLDER primarily supplies other crack cocaine dealers, but will also sell to "base heads," crack cocaine users.

28.  Law enforcement officers have intercepted 706 telephone calls between HOLDER and WILSON using the SUBJECT TELEPHONE.  Based on their training and experience, law enforcement officers believe many of those telephone calls to relate to narcotics transactions, including the following examples:

a.  On or about February 27, 2007, monitoring agents intercepted a conversation between WILSON and HOLDER. Based on other intercepts, monitoring agents believe that WILSON traveled to the Bronx to purchase powder cocaine from LUGO on

---

[7]  There were two other individuals in the van at the time of the traffic stop.  The driver produced identification in the name of "Ramon Santiago-Martinez."  The rear-seat passenger stated that he did not have any identification, but claimed to be "Juan P. Estrella."

February 27, 2007. The following is a transcript of the relevant portion of the conversation over the SUBJECT TELEPHONE:

HOLDER:     YO YO.

WILSON:     YEAH.

HOLDER:     MEAT, CAN YOU DO ME A FAVOR, MEAT?

WILSON:     YEAH.

HOLDER:     CAN YOU BRING THAT SHIT TO MY CRIB, REAL QUICK MEAT?

WILSON:     I AM ON MY WAY BACK OUT TO WEIGH THE UM, TO (INAUDIBLE), I GOTTA GO TO THE UM--YA KNOW.

HOLDER:     FUCK, AIGHT.

It is the opinion of the monitoring agents, based upon their training and experience and the context of this conversation and others that HOLDER wants WILSON to bring his share of the powder cocaine to HOLDER's "crib," SUBJECT PREMISES #2. WILSON tells HOLDER "I am on my way back out to "weigh the um...," then WILSON stops short of saying whatever word he would use for drugs. A short time later that the evening, monitoring agents intercepted a call wherein WILSON told HOLDER there was a problem with the cocaine and that he is returning to the Bronx. HOLDER tells WILSON to give him whatever drugs WILSON possesses and HOLDER will pay WILSON for the drugs. Based on subsequent wire intercepts, agents learned that WILSON was not able to meet with LUGO later that evening to rectify the shortage of powder

cocaine, but that WILSON traveled to the Bronx the following day
to rectify the problem.

b.  On March 3, 2007, monitoring agents
intercepted a call from WILSON to HOLDER.  The following is a
transcript of the relevant portion of the conversation over the
SUBJECT TELEPHONE:

WILSON:   YO MEAT.

HOLDER:   HEY, WHAT UP, MEAT?

WILSON:   DAMN NIGGA I BEEN HITTIN' YOU FOR AN HOUR, WHERE
          YOU AT?

HOLDER:   AT THE CRIB.

WILSON:   CAN YOU COME OVER HERE?  YOU GOT THE CAR?

HOLDER:   YEAH.

WILSON:   YEAH, BRING THE UM...BRING THE THING OUT THAT YOU
          GOT OF MINE..UMMM....THE BOWL. YOU KNOW, GLASS.

HOLDER:   ALRIGHT.

WILSON:   I JUST DID SOME AND I NEED YOU HERE TO (INAUDIBLE)
          AS QUICK AS YOU CAN.

HOLDER:   ALRIGHT.

WILSON:   YOU DIDN'T SEE ME HITTIN' YOUR PHONE?

HOLDER:   NAH, I WAS (INAUDIBLE).... I WAS HITTIN'
          (INAUDIBLE)....CHECKIN' TO MAKE SURE YOU WAS
          ALRIGHT.

WILSON:   NIGGA, I SENT YOU PHONE ALERTS TO THIS PHONE, THE
          OTHER PHONE, AN HOUR AGO.

HOLDER:   ALRIGHT I'LL BE RIGHT THERE, MY BAD.

```
WILSON:    ALRIGHT TRY AND RUSH, I WANT YOU DO SOMETHING
           BEFORE....HURRY UP, I'M DOING SOMETHING...I'M
           GONNA SHOW YOU SOMETHING, BRING THE THING.
```

Based on their training and experience and their knowledge of this investigation, monitoring agents believe that, in this call, WILSON is telling HOLDER that he is in the process of cooking powder cocaine into crack cocaine ("I just did some..."). Additionally, WILSON asks HOLDER to bring the glass dish that is used to cook powder cocaine into crack cocaine ("Yeah, bring the um...bring the thing out that you got of mine..ummm....the bowl. You know, glass."). Additionally, it is apparent from the call that HOLDER is at his "crib," SUBJECT PREMISES #2, and has the glass bowl, which WILSON needs in order to cook the crack cocaine.

           c.  On April 7, 2007, monitoring agents intercepted an conversation between WILSON and HOLDER regarding a trip to the Bronx, New York to purchase cocaine from LUGO. The following is a transcript of the relevant portion of the conversation over the SUBJECT TELEPHONE:

```
WILSON:   WHAT UP? WHAT UP MEAT?

HOLDER:   WHAT'S GOIN ON WITH YOU KID?

WILSON:   AIN'T SHIT, I'M JUST COOLIN, WHAT'S THE DEAL?

HOLDER:   WHOEVER MAKE A MOVE, LET ME KNOW.

WILSON:   OK, YOU WANNA GET IN TOUCH WITH, UMM, QUEEN B
          [HAYWOOD MITCHELL] THEN AND TELL HIM WE WANNA MEET
          UP WITH HIM AND TALK TO HIM.
```

HOLDER:    ALRIGHT.

It is the opinion of the monitoring agents, based upon their training and experience and the context of this conversation and others that this conversation is WILSON and HOLDER discussing a trip into the Bronx to purchase cocaine ("make a move").  The conversation is significant in that it references "Queen B," who is believed to be the defendant HAYWOOD MITCHELL.  Additionally, as set forth more fully below, two days later law enforcement officers observed MITCHELL conduct what is believed to have been a narcotics transaction with LUGO and/or a member of his organization in the Bronx.

### D.    HAYWOOD MITCHELL, also known as "Beano" and "Queen B"

29.   CS-15 identified "Beano," who is known to law enforcement as the defendant HAYWOOD MITCHELL, as a large cocaine trafficker in the Wyandanch, New York area.  CS-15 indicated that he/she had purchased a total of up to 200 grams of cocaine from MITCHELL, and suspected that MITCHELL would be able to supply as much as a kilogram of cocaine at any one time.

30.   Law enforcement officers have intercepted 395 telephone calls between MITCHELL and WILSON using the SUBJECT TELEPHONE.  Based on their training and experience, law enforcement officers believe many of those telephone calls to relate to narcotics transactions, including the following examples:

25

a. On March 9, 2007, monitoring agents intercepted a telephone call between MITCHELL and WILSON. The following is a transcript of the relevant portion of the conversation over the SUBJECT TELEPHONE:

MITCHELL: WHERE YOU AT?

WILSON: I'M AT THE GYM BUT I'M LEAVING THE GYM NOW. MY MAN FROM QUEENS CALLED ME. TOLD ME TO GET IN TOUCH WITH "D". IF YOU DON'T FEEL LIKE SITTING AROUND....................IF YOU DON'T FEEL LIKE SITTING AROUND.

MITCHELL: WHAT'S, WHAT'S HIS NAME DOING?

WILSON: HE SAID HE'LL BE HERE ANY MINUTE. HE WAS LISTENING TO THE RADIO. YO WHAT UP?

MITCHELL: I TOLD YOU TO LEAVE THAT. MAKE GOOD ON THAT THING YOU GOT FROM UM......I NEED THAT TODAY. YOU GOT SOME FROM MEL THAT DAY (I/A).

WILSON: I CAN'T HEAR YOU.

MITCHELL: THE ONE THAT YOU GOT FROM....THAT DAY.....FROM MEL. THAT YOU SAID TO DO THAT THING JUST TO DO. FROM MEL THAT DAY.

WILSON: I'M NOT SURE BUT ................. YOU IT NEED RIGHT NOW.

MITCHELL: BEFORE TEN.

WILSON: I CAN'T HEAR YOU REALLY.

MITCHELL: THAT DAY MEL CAME HOME, YOU CAME BY.

WILSON: YEAH....OH YEAH. YOU NEED IT?

MITCHELL: YEAH.

WILSON: WHEN AM I GOING TO GET IT? IT'S NINE O'CLOCK.

MITCHELL: TEN O'CLOCK YOU GOT TILL.

26

It is the opinion of the monitoring agents, based upon their training and experience and the context of this conversation and others, that this conversation is an attempt by MITCHELL to get WILSON to repay him some cocaine that he owes him. MITCHELL and WILSON are trying to speak in code regarding the cocaine.[8]  A continuation of the above discussion occurred on March 11, 2007, as described in the conversation described below.

            b.  On March 11, 2007, monitoring agents intercepted an outgoing call from WILSON to MITCHELL.  The following is a transcript of the relevant portion of the conversation over the SUBJECT TELEPHONE:

MITCHELL: WHY DIDN'T YOU GO TO THE HOSPITAL?

WILSON:    UMMM, BECAUSE THAT THING I WAS SUPPOSED TO REPLACE OF YOURS, REMEMBER THAT THING I WAS SUPPOSED TO REPLACE?  TO GIVE BACK TO YOU?

MITCHELL: YEAH.

WILSON:    I HAD SOME OF THAT.

On the morning of March 11, 2007, WILSON was involved in an automobile accident.  This accident was documented by the Suffolk

---

[8] At the end of the call WILSON and MITCHELL attempt to make the whole conversation appear as if it is pertaining to a bottle of alcohol.  Based on my training and experience, that attempted method of code or concealment makes the conversation appear even more relevant in regards to a cocaine transaction.  Specifically, based on my experience, individuals do not have coded conversations about replacing a bottle of alcohol that was previously borrowed or loaned.  Rather, the mention of the bottle of alcohol is used as a diversionary tactic to avoid revealing the substance of the conversation.

27

County Police Department and was discussed at length in several intercepted calls over the SUBJECT TELEPHONE. It is the opinion of the monitoring agents, based upon their training and experience and the context of this conversation, that WILSON told MITCHELL that WILSON did not go to the hospital immediately after the automobile accident because he was in possession of cocaine and/or crack cocaine.

31. Additionally, law enforcement officers have conducted surveillance of MITCHELL, which in combination with wire intercepts, reveal that he has made at least one trip into the Bronx to purchase cocaine from LUGO during the period of wire interception.

32. On April 9, 2007, law enforcement officers observed a gray Honda CRV with New York license plate number CXL-4563 (the "CRV") with a female driver and a male passenger in the area of the Bronx where the WILSON ORGANIZATION purchases cocaine from LUGO. Surveillance was continued at a Dunkin' Donuts located at 5501 Broadway in the Bronx, New York (the "Dunkin' Donuts").[9] The passenger exited the CRV and was recognized as the defendant HAYWOOD MITCHELL. MITCHELL entered the Dunkin' Donuts where he met with an unidentified, dark-skinned male with

_____

[9] On February 27, 2007, monitoring agents intercepted an outgoing call from WILSON to LUGO. During that conversation, WILSON told LUGO that he was in the Bronx at the Dunkin' Donuts and wanted to meet him.

short hair.  MITCHELL and the individual returned to the CRV,
entered the vehicle and drove away.  Later that evening, law
enforcement officers conducted surveillance at MITCHELL's
residence, SUBJECT PREMISES #8, and observed the CRV, with the
same license plate parked across the street from SUBJECT PREMISES
#8.

   **E.    LORENZO WARREN, also known as "Lo":**

        33.   CS-12 identified the defendant LORENZO WARREN as a
large-scale crack cocaine distributor operating in the Wyandanch,
New York area.  Further, CS-12 stated that WARREN is supplied
with crack cocaine by WILSON.  Additionally, wire intercepts have
revealed that WARREN purchases crack cocaine from LUGO, WILSON's
source of supply in the Bronx.

        34.   Additionally, CS-21 and CS-22 informed law
enforcement officers that they have purchased cocaine base from
WARREN on numerous occasions.  According to CS-21 and CS-22, they
recently purchased cocaine base from WARREN on April 18, 2007.
CS-21 and CS-22's information has been corroborated by wire
intercepts and physical surveillance.

        35.   Law enforcement officers have intercepted 266
telephone calls between WARREN and WILSON using the SUBJECT
TELEPHONE.  Based on their training and experience, law
enforcement officers believe many of those telephone calls to

29

relate to narcotics transactions, including the following examples:

       a.  On April 17, 2007, monitoring agents intercepted a telephone call from WARREN to WILSON. The following is a transcript of the relevant portion of the conversation over the SUBJECT TELEPHONE:

> WARREN:  MEAT, WHAT UP MEAT?
>
> WILSON:  WHAT'S GOING ON WHY YOU TAKING SO LONG TO ANSWER?
>
> WARREN:  MY PHONE IS FUCKED UP.  I GOT A DIFFERENT…I GOT MY OLD FUCKING PHONE, SO I LOST EVERYBODY FUCKING NUMBER MAN, EVERYBODY NUMBER.
>
> WILSON:  (INAUDIBLE)
>
> WARREN:  YOU...YOU IN THE HOOD?
>
> WILSON:  YEAH, WHERE YOU AT?
>
> WARREN:  I'M AT FOUR FIVE.
>
> WILSON:  ALRIGHT.
>
> WARREN:  I BE THERE.

It is the opinion of the monitoring agents, based upon their training and experience and the context of this conversation that WARREN is arranging to meet with WILSON to obtain crack cocaine from WILSON.  When WARREN states "I'm at four five," he is telling WILSON that he is at SUBJECT PREMISES #6, 45 Bedford Avenue, Wyandanch, New York, which is in close proximity to WILSON's residence, SUBJECT PREMISES #1.  SUBJECT PREMISES #6 is well-known to local law enforcement as a crack cocaine

distribution location. At short while later, surveillance agents observed WARREN meet with WILSON at SUBJECT PREMISES #1.

b. On April 18, 2007, monitoring agents intercepted a telephone conversation between WARREN and WILSON. The following is a transcript of the relevant portion of the conversation over the SUBJECT TELEPHONE:

WARREN:     WHERE YOU AT?

WILSON:     I'M IN THE HOOD. I'M UMM, WHAT'S GOOD THOUGH?

WARREN:     I WAS GONNA COME SEE YOU REAL QUICK.

WILSON:     I GOTTA COME UP TOWARDS YOUR WAY SO UM I'LL MEET YOU, I GOTTA GO PICK UP THE KIDS, I'LL RIDE PAST AND HOLLER AT YOU.

WARREN:     ALRIGHT I'M AT MY MOM'S CRIB.

WILSON:     ALRIGHT I'LL BE OVER THERE IN THREE MINUTES.

WARREN:     ALRIGHT.

At approximately 2:47 p.m., surveillance agents observed WILSON and WARREN driving in separate vehicles in the vicinity of Hastings Avenue, Dix Hills, New York. A short while later, surveillance agents observed WILSON and WARREN arriving at and entering SUBJECT PREMISES #1.

36. At approximately 2:57 p.m., CS-21 and CS-22 conducted a controlled purchase of cocaine base from WARREN under the supervision of law enforcement officers. During the meeting, law enforcement officers observed WARREN meeting with CS-21 and CS-22 at a certain location in Wheatley Heights, New York. While

under surveillance, WARREN and CS-21 and CS-22 completed what appeared, based on the agents' training and experience, to be a narcotics transaction.  Subsequently, CS-21 and CS-22 informed law enforcement officers that WARREN had sold them approximately an ounce of cocaine base for $950.00 during that meeting and the agents recovered the ounce of cocaine base from CS-21 and CS-22.

**F.    MELVIN TUCKER, also known as "Tuck"**

37.    On or about January 30, 2007, CS-12 was interviewed by law enforcement officers.  CS-12 stated that the defendant MELVIN TUCKER is WILSON's main "cooker" of crack cocaine.

38.    On or about March 23, 2007, CS-24 was interviewed by law enforcement officers.  CS-24 stated that the defendant MELVIN TUCKER cooks powder cocaine into crack cocaine for WILSON. CS-24 further stated that TUCKER is able to increase the size of the powder cocaine by twenty percent (20%) when he cooks it into crack cocaine.  In addition to cooking the crack cocaine, CS-24 stated that TUCKER sells crack cocaine for WILSON.

39.    Law enforcement officers have intercepted 1,028 telephone calls between TUCKER and WILSON using the SUBJECT TELEPHONE.  Based on their training and experience, law enforcement officers believe many of those telephone calls to relate to narcotics transactions, including the following examples:

a. On February 27, 2007, monitoring agents intercepted a conversation between TUCKER and WILSON. The following is a transcript of the relevant portion of the conversation over the SUBJECT TELEPHONE:

WILSON:    YO, WHERE ARE YOU AT?

TUCKER:    (INAUDIBLE) IN HUNTINGTON

WILSON:    IN HUNTINGTON?!

TUCKER:    YEAH, DOWN AT BILLIE'S.

WILSON:    YOU COMING TO THE HOOD?

TUCKER:    WHAT?

WILSON:    YOU COMING TO WYANDANCH?

TUCKER:    I THOUGHT YOU WERE COMING TO ME?

WILSON:    I AIN'T COMING TO NO DAMN HUNTINGTON!

TUCKER:    NOT EVEN FOR THAT DOLLAR FIFTY (150).

WILSON:    I JUST LEFT THE BAR, MEL.

TUCKER:    MAN, YOU CAN'T DO THAT SHIT TO ME. I AIN'T GOT NO TRANSPORTATION NOW. SHIT.

WILSON:    I'M GONNA HIT YOU RIGHT BACK. I MIGHT (UNINTELLIGIBLE). I'LL HIT YOU RIGHT BACK.

TUCKER:    I HOPE SO CAUSE I'M MISSING OUT RIGHT NOW.

It is the opinion of the monitoring agents, based upon their training and experience and the context of this conversation and others that TUCKER wants WILSON to deliver crack cocaine. TUCKER emphasizes the urgency for a delivery of drugs from WILSON by saying "I'M MISSING OUT RIGHT NOW." As set forth above, CS-24

has informed law enforcement that TUCKER not only cooks crack cocaine for WILSON, but TUCKER also sells crack cocaine for WILSON.

    b. On April 16, 2007, monitoring agents intercepted an incoming call to WILSON from an unidentified female ("U/F"), who was looking for TUCKER.  During the call, the U/F stated, "I need to speak with Melvin, please."  Monitoring agents then recognized the voice of TUCKER on the phone.  The following is a transcript of the relevant portion of the conversation over the SUBJECT TELEPHONE:

   WILSON:  HELLO.

   U/F:  I NEED TO SPEAK WITH MELVIN, PLEASE.

   TUCKER:  HELLO.

   U/F:  WOMAN CLAIMING ITS TWO G'S SHORT.

   TUCKER:  (INAUDIBLE)

   U/F:  THAT'S WHAT SHE JUST CALLED AND TOLD ME, MEL. YOU CALL HER AND TALK TO HER.  I'M JUST RELAYING THE MESSAGE.

   TUCKER:  WAIT UNTIL I GET TO THE HOUSE.

It is the opinion of the monitoring agents, based upon their training and experience and the context of this conversation and others that when the U/F states, "Woman claiming its two G's short," she is informing TUCKER that one of his female customers is complaining that she was shorted two grams of crack cocaine during a recent narcotics transaction with TUCKER.

## G. DARYL GRICE, also known as "Nick Nack"

40. The defendant DARYL GRICE has been identified as an associate in the WILSON ORGANIZATION, who distributes crack cocaine for WILSON. For example, on or about January 18, 2007, CS-3 was interviewed by law enforcement. CS-3 stated that an individual known to him/her as "Nick Nack" delivers crack cocaine for WILSON. Based on intelligence from local law enforcement and wire intercepts, law enforcement has confirmed that "Nick Nack" is GRICE's nickname.

41. Law enforcement officers have intercepted 1,138 telephone calls between GRICE and WILSON using the SUBJECT TELEPHONE. Based on their training and experience, law enforcement officers believe many of those telephone calls to relate to narcotics transactions, including the following examples:

a. On or about March 9, 2007, monitoring agents intercepted an incoming from GRICE to WILSON. The following is a transcript of the relevant portion of the conversation over the SUBJECT TELEPHONE:

WILSON:   WHAT UP?

GRICE:    YO YOU GOTTA REALLY WORK WITH THIS STUFF YOU KNOW.
          I DON'T DOING IT OR WHAT. IT'S TWO DIFFERENT
          THINGS IN THERE.

WILSON:   IMPOSSIBLE, IT'S ALL TOGETHER.

GRICE:    I KNOW THAT I KNOW THAT BUT I'M TELLING YOU IT'S
          TWO DIFFERENT THINGS IN THERE.

WILSON:    SO WHAT ARE YOU TRYING TO SAY?

GRICE:     GOT SEPARATED SOME, I'M GONNA GO TO THE BOTTOM
           SOME, GONNA STAY ON THE TOP. TAKE THE STUFF, THE
           TOP FIRST AND LET OTHER....THE STUFF ON TOP IS
           VERY, VERY, VERY LIGHT AND, AHH, THERE'S A HELL OF
           A LOT MORE THAN IT LOOKS LIKE.

It is the opinion of the monitoring agents, based upon their
training and experience and the context of this conversation,
that GRICE and WILSON were discussing the quality of the cocaine
and the amount of "cut" in the cocaine that they recently
purchased.  "Cut" is usually a relatively inexpensive,
non-narcotic substance that is blended into the cocaine to
increase the total weight of the cocaine mixture, thereby
increasing the amount of profit when the cocaine is sold.
Additionally, it is believed that GRICE was in the process of
converting the powder cocaine into crack cocaine.  It is the
opinion of the monitoring agents, based upon their training and
experience, that an excessive amount of "cut" negatively affects
the quantity and quality of the crack cocaine that is
manufactured from powder cocaine.

          b.  On March 15, 2007, monitoring agents
intercepted an outgoing call from WILSON to GRICE.  The following
is a transcript of the relevant portion of the conversation over
the SUBJECT TELEPHONE:

WILSON:    YO, YO.

GRICE:     WHAT'S UP MAN? YOU GET THE GAME TIGHT YET?

WILSON:   IT'S IN THE PROCESS, COME THRU IN A HALF HOUR.

GRICE:   ALRIGHT I'M GONNA NEED THAT ANYWAY.

It is the opinion of the monitoring agents, based upon their training and experience and the context of this conversation, that GRICE is asking if WILSON had finished converting powder cocaine into crack cocaine ("You get the game tight, yet?"). WILSON replies that it is still in the process of being converted ("It's in the process.") and that it would be ready in a half hour ("come through in a half hour").

## H.  DENISE NEWCOMBE

42.  Multiple confidential sources and wire intercepts have confirmed that the defendant DENISE NEWCOMBE sells cocaine base for the WILSON ORGANIZATION.

43.  On or about January 30, 2007, CS-12 was interviewed by law enforcement.  CS-12 stated that the defendant DENISE NEWCOMBE is an ex-girlfriend of WILSON.  Further, CS-12 stated that NEWCOMBE sells crack cocaine for WILSON.

44.  On or about March 10, 2007, CS-25 was interviewed by law enforcement.  CS-25 stated that he/she has purchased crack cocaine from NEWCOMBE and/or WILSON on numerous occasions, including earlier that day.  When CS-25 had contacted WILSON to purchase crack cocaine on March 10th, WILSON directed CS-25 to go to SUBJECT PREMISES #5, 4 Carriage Court, Dix Hills, New York. When CS-25 arrived at that location, he/she gave NEWCOMBE cash to

purchase crack cocaine. CS-25 observed NEWCOMBE meet with WILSON. NEWCOMBE then returned and gave CS-25 the crack cocaine.

45. On March 23, 2007, CS-24 was interviewed by law enforcement officers. CS-24 stated that, on multiple occasions, the defendant DENISE NEWCOMBE sold crack cocaine to him/her from WILSON.

46. Law enforcement officers have intercepted 150 telephone calls between NEWCOMBE and WILSON using the SUBJECT TELEPHONE. Based on their training and experience, law enforcement officers believe many of those telephone calls to relate to narcotics transactions, including the following example:

a. On March 18, 2007, monitoring agents intercepted an incoming call from NEWCOMBE to WILSON. The following is a transcript of the relevant portion of the conversation over the SUBJECT TELEPHONE:

WILSON:    HEY, WHAT'S UP?

NEWCOMBE: LET ME KNOW WHEN THERE IS SOMETHING NEW, OKAY?

WILSON:    YEAH, IT'S THAT BAD?  RIGHT?

NEWCOMBE: IT'S KIND OF YUCKY.

WILSON:    OKAY, GOOD, GOOD, YOU KNOW WHAT IT IS, LIKE I TOLD
           YOU ANYTIME ITS LIKE THAT, JUST LET ME KNOW CAUSE
           I DON'T KNOW MYSELF, LET ME KNOW SO I CAN GET
           MYSELF PREPARED.

NEWCOMBE: YEAH, I WOULD DEFINITELY DO SOMETHING DIFFERENT.

38

```
WILSON:    ALRIGHT, RATHER THAN...WHAT THEY DO IS THAT THEY
           JUST FUCKING SIT AND TALK ABOUT YOU WHEN IT IS
           BAD.  ALL YOU GOTTA DO IS LET ME KNOW SO I CAN FIX
           IT, CAUSE I DON'T DO IT.

NEWCOMBE: I HEAR YA.

WILSON:    ALRIGHT, THANKS A LOT BABE. I WILL WORK ON
           SOMETHING FOR YOU OKAY?

NEWCOMBE: ALRIGHT, I WILL TALK TO YOU LATER.
```

It is the opinion of the monitoring agents, based upon their training and experience and the context of this conversation and others that NEWCOMBE tells WILSON that the quality of the crack cocaine he is selling is poor ("It's kind of yucky."). WILSON tells NEWCOMBE that she needs to tell him when the quality is poor so that he can fix it.

### I.   **MARIE BLORE**

47.  Based on monitoring of intercepted telephone calls to and from the SUBJECT TELEPHONE, information provided by confidential sources, information from local law enforcement and a review of documentary evidence, including vehicle records, real property records, telephone records and banking records, law enforcement officers have determined that the defendant MARIE BLORE is a financial facilitator of the WILSON ORGANIZATION.

48.  A number of confidential sources, including CS-3 CS-12 and CS-24, have identified SUBJECT PREMISES #9, 105 Irving Avenue, Wyandanch, New York, as a "crack house," which is supplied with crack cocaine by the WILSON ORGANIZATION.  Further,

those confidential sources have indicated that WILSON controls SUBJECT PREMISES #9, but title to the property is in BLORE's name. BLORE's ownership of SUBJECT PREMISES #9 is confirmed by the real property records. As set forth more fully below, the defendant CASANDRA MAXWELL has operated SUBJECT PREMISES #9 as a "crack house" and WILSON supplies MAXWELL with crack cocaine to sell out of SUBJECT PREMISES #9.

49. Additionally, based on intercepts from the SUBJECT TELEPHONE, law enforcement officers have learned that BLORE allows WILSON to register his vehicles in her name. Further, during the course of the investigation, WILSON has used rental vehicles in furtherance of the drug conspiracy and BLORE has rented those vehicles in her name for WILSON to use. Law enforcement officers have observed WILSON using the below-described vehicles on an almost daily basis since the initiation of the wire interception. Specifically, law enforcement officers have observed WILSON using two vehicles registered in BLORE's name, a black 2003 BMW 745i with New York license plate DTT-8684 (the "BMW") and a gray 2005 Chrysler 300M with New York license plate DKB-9686 (the "300M") to conduct what are believed, based on wire intercepts, information from confidential sources and physical surveillance, to be narcotics transactions.

50. Further, BLORE has rented four vehicles, a 2006 Ford Explorer with New York license plate CPD-2602 (the

40

"Explorer"), a 2006 Pontiac G-6 with New York license plate DFS-6157 (the "Pontiac"), a 2007 Hyundai with New York license plate DRU-9058 (the "Hyundai"), and a white Ford Taurus (the "Taurus") during this investigation. WILSON has been observed using these vehicles, on almost a daily basis, conducting what are believed, based on wire intercepts, information from confidential sources and physical surveillance, to be narcotics transactions.

51. Still further, monitoring of conversations between BLORE and WILSON over the SUBJECT TELEPHONE has revealed numerous conversations involving BLORE asking WILSON to reimburse her with money to pay credit cards bills for credit cards that are used by WILSON are in BLORE's name.

52. Based on my training and experience, drug dealers frequently attempt to conceal their ownership interests in certain assets, including without limitation houses, cars, bank accounts, cellular telephones, by registering those items in other individuals' names. Further, it is my experience that drug dealers register these assets with individuals that they know and trust and that such individuals understand why they are registering the drug dealers' assets in their name.

53. During the investigation, BLORE has been observed meeting with WILSON and MAXWELL. For example, in February 2007, BLORE was stopped by a SCPD patrol car while she was driving the 300M with WILSON and MAXWELL in the vehicle.

41

54.  Law enforcement officers have intercepted 1,444 telephone calls between BLORE and WILSON using the SUBJECT TELEPHONE.  Based on their training and experience, law enforcement officers believe many of those telephone calls to relate to narcotics trafficking, specifically, the use of narcotics proceeds, including the following examples:

a.  On March 13, 2007, monitoring agents intercepted a conversation between BLORE and WILSON pertaining to a rental car.  The conversation reflects the financial links between WILSON and BLORE.  BLORE agreed to rent an automobile for WILSON from Avis, but WILSON did not want to enter an Avis store with BLORE.  BLORE paid for the automobile using a credit card she referred to as "OUR CREDIT CARD" and stated that WILSON was going to have to pay the bill.  During that same conversation, there was discussion of other money owed by WILSON to BLORE.  It is the opinion of the monitoring agents, based upon their training and experience and the context of this conversation and others that the above call illustrates how BLORE facilitates the illegal activity of the WILSON organization by knowingly rents automobiles for WILSON, which he uses in furtherance of his narcotics distribution.

b.  On March 29, 2007, monitoring agents intercepted another voicemail left by BLORE for WILSON, which further evidences BLORE's financial involvement with WILSON.  In

this message, BLORE continues to express frustration with WILSON. BLORE tells him "WE NEED TO MEET UP AND TALK BECAUSE SEVEN YEARS I BEEN WITH YOU AND ENOUGH IS ENOUGH WITH ALL THIS BULLSHIT. **ESPECIALLY AFTER EVERYTHING WE ARE DOING**." (emphasis added). In addition to evidencing the financial relationship, in this message BLORE admits a seven year relationship with WILSON, and further implies that she knows what she and WILSON are doing is not legitimate.

        c.  On April 12, 2007, monitoring agents intercepted a telephone call between BLORE and WILSON. The following is a transcript of the relevant portion of the conversation over the SUBJECT TELEPHONE:

    WILSON:    DID YOU EVER. DID YOU GET THE OTHER INFORMATION THE ADDRESS OR YOU FIGURE IT UMM DID YOU GOOGLE IT OR MAP QUEST WHATEVER SHIT?

    BLORE:    YEP.. I ALREADY DID IT.

    WILSON:    DID YOU GO THERE?

    BLORE:    I WENT TO IT BUT I COULDN'T FIND IT. I WAS GOING TO GO BACK AND LOOK AGAIN.

    WILSON:    OK, OK GOOD GOOD I'LL TALK TO YOU. I'LL TALK TO.

    BLORE:    BUT, I DON'T THINK EITHER OF THEM ARE REAL.

    WILSON:    I'LL TALK TO YOU WHEN I SEE YOU.

It is the opinion of the monitoring agents, based upon their training and experience and the context of this conversation and others that the above portion of that conversation relates to the identity of two license plates that another individual obtained

for WILSON.  Both of the license plates corresponded to law enforcement vehicles involved in the instant investigation. Further, both license plates are registered to fictitious places and persons so as to protect the law enforcement officers that use the vehicles.  As such, when BLORE went to check these locations, utilizing google.com and/or mapquest.com, and physically going to the locations, she received negative results. Based on my knowledge of this case, BLORE was checking the addresses that correlated to the license plates run by the law enforcement officer.

d.  On April 22, 2007, monitoring agents intercepted a voice mail message left by BLORE for WILSON on the SUBJECT TELEPHONE.  In that message, BLORE references **"ALL THE SHIT YOU TOLD ME WITH THE COPS AND WHATEVER."** (emphasis added). It is the opinion of the monitoring agents that this statement by BLORE reflects her awareness of WILSON's criminal activities. Further it reflects that WILSON has informed BLORE that he believes he is under investigation by law enforcement.

**J.    JAMES ARENA**

55.  A number of confidential sources, including CS-3, CS-12 and CS-24 have identified the defendant JAMES ARENA as a distributor of crack cocaine for the WILSON ORGANIZATION. Specifically, those sources have indicated that ARENA sells crack cocaine, along with NEWCOMBE and others, at SUBJECT PREMISES #5.

44

That house has been identified by the aforementioned sources a "crack house," which is supplied with crack cocaine by the WILSON ORGANIZATION.

56. Law enforcement officers have intercepted 1,623 telephone calls between ARENA and WILSON using the SUBJECT TELEPHONE. Based on their training and experience, law enforcement officers believe many of those telephone calls to relate to narcotics transactions, including the following examples:

a. On March 2, 2007, monitoring agents intercepted a conversation between ARENA and WILSON. The following is a transcript of the relevant portion of the conversation over the SUBJECT TELEPHONE:

WILSON:   HELLO.

ARENA:    HELLO.

WILSON:   WHAT'S UP.

ARENA:    AH... I WANNA GIVE YOU 200 DOLLARS.

WILSON:   NO PROBLEM TALK TO YOU WHEN YOU SAID WHENEVER YOUR READY.

ARENA:    ALL RIGHT I'LL BE HERE.

WILSON:   NOW I CAN GET IT?

ARENA:    I GOTTA GO CASH MY CHECK.

WILSON:   WHEN YOU GO TO CRAZY BILL'S, CALL ME.

ARENA:    ALRIGHT.

WILSON:   BYE.

It is the opinion of the monitoring agents, based upon their training and experience and the context of this conversation and others that ARENA and WILSON were setting up a meeting so that ARENA could pay WILSON for the crack cocaine that he picked up earlier.

                      b.  On March 8, 2007, monitoring agents intercepted a conversation between ARENA and WILSON over the SUBJECT TELEPHONE. The following is a transcript of the relevant portion of the conversation over the SUBJECT TELEPHONE:

ARENA:     THAT'S IT YOU KNOW WHAT I MEAN (IA) YO WHEN YOU COMING THRU ACTUALLY CAN WE COME TO YOU, 'CAUSE I GOT RACHEL STILL HERE.

WILSON:    YOU GOT ME RIGHT NOW.

ARENA:     CAN I COME THROUGH NOW?

WILSON:    I'M NOT COMING THROUGH THERE.

ARENA:     NO I'LL COME TO YOU.

WILSON:    MEET ME AT HALF HOLLOW HILLS ROAD RIGHT KNOW.

ARENA:     WHERE'S THAT RIGHT, RIGHT UP THE BLOCK?

WILSON:    YEAH, RIGHT NOW.

It is the opinion of the monitoring agents, based upon their training and experience and the context of this conversation and others that ARENA is trying to order some crack cocaine from WILSON.  ARENA uses the phrase "come through," which based on this and other wire interceptions, is used as a code by ARENA and other members of the WILSON ORGANIZATION to order crack cocaine

from WILSON. Further, when WILSON states he is not "coming through there," he is stating that he does not want to go to SUBJECT PREMISES #5 due to an increased police presence there due to recent arrests and media reports. ARENA tells WILSON he will come meet him and they set up a meeting spot as referenced in the call.

57. On April 27, 2007, CS-3 agreed to make a consensually monitored and recorded telephone call to ARENA. During that conversation, CS-3 and ARENA discussed, in sum and substance, the current price of crack cocaine. ARENA agreed to sell ten grams of crack cocaine to CS-3 for $400.00, $40.00 per gram. ARENA told CS-3 that he had the crack cocaine with him and that he was ready to meet with CS-3.

### K. CASANDRA MAXWELL, also known as "KK":

58. As set forth above, a number of confidential sources, including CS-3, CS-12 and CS-24, have identified SUBJECT PREMISES #9 as a "crack house," which is supplied with crack cocaine by the WILSON ORGANIZATION. Further, those confidential sources have indicated that WILSON controls SUBJECT PREMISES #9,[10] MAXWELL operates the crack house and WILSON supplies MAXWELL with crack cocaine to sell out of SUBJECT PREMISES #9.

---

[10] As set forth above, SUBJECT PREMISES #9 is owned by the defendant MARIE BLORE. Further, as set forth herein, WILSON uses BLORE to facilitate various financial aspects of his operation, including registering a residence and vehicles in her name.

47

59.  Law enforcement officers have intercepted 347 telephone calls between MAXWELL and WILSON using the SUBJECT TELEPHONE.  Based on their training and experience, law enforcement officers believe many of those telephone calls to relate to narcotics transactions, including the following examples:

a.  On March 2, 2007, monitoring agents intercepted a telephone conversation between MAXWELL and WILSON. The following is a transcript of the relevant portion of the conversation over the SUBJECT TELEPHONE:

WILSON:   WHAT UP K?

MAXWELL:  GOD DAMN IT'S ABOUT FUCKING TIME I SAID.

WILSON:   I WAS OUT COLD MAN.

MAXWELL:  NO BABY DON'T GO BACK OUT COLD. I NEED TO MAKE A
          DO TO DO      .

WILSON:   OK WHERE YOU AT?

It is the opinion of the monitoring agents, based upon their training and experience and the context of this conversation and others that WILSON and MAXWELL are discussing the fact that she needs WILSON to resupply her with crack cocaine.  Based on this and other intercepts, MAXWELL and WILSON use the term "do to do" to communicate the need for more crack cocaine, usually at SUBJECT PREMISES #9.  The following day, monitoring agents intercepted a similar conversation, where MAXWELL again requested to "DO THE DO" from WILSON.

b.     On March 3, 2007, monitoring agents intercepted a telephone conversation between MAXWELL and WILSON. The following is a transcript of the relevant portion of the conversation over the SUBJECT TELEPHONE:

WILSON:     HEY YO.

MAXWELL:    YEAH I NEED THIS, I GOT TO HAVE THIS (INAUDIBLE).

WILSON:     HEY WHERE YOU AT MAN?

MAXWELL:    THERE IS LIKE A THOUSAND PEOPLE HERE NOW.

WILSON:     ALRIGHT, JUST COME OUTSIDE.

It is the opinion of the monitoring agents, based upon their training and experience and the context of this conversation and others that MAXWELL operates the crack house at SUBJECT PREMISES #9 and this particular conversation pertained to MAXWELL telling WILSON that she had a lot of people at the crack house and that she needed more crack cocaine to sell to the people.

c.     On March 12, 2007, monitoring agents intercepted a telephone conversation between MAXWELL and WILSON. During that conversation, MAXWELL informs WILSON that a "WHITE CHICK OVER THERE...AT POPS' [SUBJECT PREMISES #5]" had been arrested after purchasing crack cocaine ("SHE GOT THE DO") at SUBJECT PREMISES #5. MAXWELL informed WILSON that the police had asked questions about WILSON, MAXWELL and the "BLACK BEAM." At the time, WILSON was driving the BMW, which was later wrecked in a car accident, and the "BLACK BEAM" appears to be a reference to that vehicle.

Based on information provided by the SCPD, this conversation references the arrest of CS-25, which occurred in the vicinity of SUBJECT PREMISES #5 on March 10, 2007.

**L.     ASHANTI HARRELL, also known as "Footie"**

60.     The defendant ASHANTI HARRELL has been identified by confidential sources and wire intercepts as a customer of the WILSON ORGANIZATION who is supplied with cocaine base.

61.     On or about April 19, 2006, CS-6 was interviewed by law enforcement officers.  CS-6 identified WILSON as one of the largest crack cocaine dealers in Wyandanch.  Further, CS-6 stated that WILSON supplies an individual by the name of "Footie," who is known to law enforcement as HARRELL, with both cocaine base and firearms.

62.     On or about September 9, 2006, CS-3 was interviewed by law enforcement officers.  CS-3 also identified WILSON as one of the largest crack cocaine dealers in Wyandanch. Further, CS-3 stated that WILSON supplies a number of other narcotics dealers with cocaine base, including HARRELL.

63.     Law enforcement officers have intercepted 152 telephone calls between HARRELL and WILSON using the SUBJECT TELEPHONE.  Based on their training and experience, law enforcement officers believe many of those telephone calls to relate to narcotics transactions, including the following examples:

a. On March 1, 2007, monitoring agents intercepted a conversation between HARRELL and WILSON. WILSON tells HARRELL that he is "IN TRANSITION, IT WILL BE EVERYTHING BY TIME, SHOULD BE BY THE TIME YOU GET AROUND." Based on other wire interceptions, monitoring agents became aware that WILSON had arranged a trip to the Bronx to purchase cocaine from LUGO, just prior to this conversation with HARRELL. Additionally, immediately prior to WILSON speaking with HARRELL, WILSON speaks with another co-conspirator, WARREN, and tells him "I'LL HIT YOU IN A LITTLE, I'M IN THE BX RIGHT NOW. SO WHEN I GET BACK IN THE HOOD, I'LL HAND IT BACK..." Prior to the next call to HARRELL, WILSON is intercepted speaking to LUGO to negotiate the purchase of some powder cocaine in the Bronx. It is the opinion of the monitoring agents, based upon their training and experience and the context of this conversation, that WILSON was purchasing cocaine in the Bronx ("in transition") and he was telling HARRELL that by the time he gets back to Wyandanch, WILSON will be ready to sell him narcotics.

b. Another conversation between WILSON and HARRELL took place approximately an hour and one-half later on March 1, 2007. The following is a transcript of the relevant portion of that conversation:

HARRELL:   DEZO WHAT'S GOOD

WILSON:    I'M GETTIN' IT RIGHT, RIGHT NOW YOU KNOW, LIKE AN
           HOUR AND SOME CHANGE, WE'RE GOOD.

51

```
HARRELL:   ALRIGHT THEN HOLLAR AT ME, I'LL PROBABLY BE
           KNOCKED THE FUCK OUT BY THEN..JUST HOLLAR AT ME..

WILSON:    ALRIGHT, YOU WAKE UP HIT ME, I'M GONNA BE UP

HARRELL:   HOLLAR...
```

It is the opinion of the monitoring agents, based upon their training and experience and the context of this conversation, as well as the conversations leading up to it, that WILSON is telling HARRELL that he is "GETTIN' IT RIGHT, RIGHT NOW," the "it" being narcotics and that WILSON will be ready to complete a narcotics transaction in just over an hour.

          c.   In connection with the above interception, agents conducted surveillance of WILSON's residence, SUBJECT PREMISES #1. Law enforcement officers observed a red 2007 Toyota Camry, bearing New York registration "DRW-2052" (the "Camry"), arrive in front of SUBJECT PREMISES #1 and park in the street in front of the residence.[11] Further, the officers observed an unidentified male emerge from the driver's side of the vehicle and walk into the driveway of WILSON's residence. Shortly thereafter, the unidentified male returned from WILSON's residence, enter the Camry and drive away from the area. Surveillance was then terminated. At the time when the Camry arrived at WILSON's residence, monitoring agents intercepted a

---

[11] The Camry is registered to Enterprise Rent-A-Car, doing business as "Elrac Inc.," 1550 Route 23 North, Wayne, New Jersey.

call from HARRELL to WILSON, telling WILSON that HARRELL was outside. Thus, based on information from the wire interceptions and physical surveillance, it is believed that the unidentified male was HARRELL and he was at WILSON's residence to purchase crack cocaine.

**M.  LEONARD MCCLOUD:**

64.  Based on monitoring of intercepted telephone calls to and from the SUBJECT TELEPHONE, intelligence from local law enforcement and a review of documentary evidence, including telephone records, law enforcement officers have determined that the defendant LEONARD MCCLOUD is a crack cocaine distributor, who is supplied with narcotics by the WILSON ORGANIZATION.

65.  Law enforcement officers have intercepted 311 telephone calls between MCCLOUD and WILSON using the SUBJECT TELEPHONE.  Based on their training and experience, law enforcement officers believe many of those telephone calls to relate to narcotics transactions, including the following examples:

a.  On March 1, 2007, monitoring agents intercepted a telephone call between MCCLOUD and WILSON.  The following is a transcript of the relevant portion of the conversation over the SUBJECT TELEPHONE:

WILSON:   YO, WHAT UP MEAT?
MCCLOUD:  WHAT UP SON?

53

WILSON:     THAT'S WHAT I'M DOING NOW, MEAT.  THEM NUMBERS IS
                    CRAZY MEAT, ITS FUCKING EVERYTHING DIFFERENT. I'M
                    OVER HERE WITH THESE PEOPLE NOW AND HE'S BUGGING
                    THE FUCK OUT.

Based on other interceptions, some of which are described above,

law enforcement officers are aware that WILSON was in the Bronx

at the time of the above conversation with MCCLOUD.  The

references to "THAT'S WHAT I'M DOING NOW, MEAT" and "I'M OVER

HERE WITH THESE PEOPLE NOW" are references to the fact that

WILSON was meeting with LUGO and/or his associates to purchase

crack cocaine.  Specifically, WILSON was picking up the cocaine

he believes he was "shorted" when he purchased cocaine from LUGO

on February 27, 2007.  It is the opinion of the monitoring

agents, based upon their training and experience and the context

of this conversation, that MCCLOUD is looking to obtain narcotics

from WILSON and WILSON tells MCCLOUD that he is "doing [it] now"

and obtaining the narcotics from his "people."

                b.  On March 20, 2007, monitoring agents

intercepted a series of telephone calls between MCCLOUD and

WILSON.  The following is a transcript of the relevant portions

of the conversations over the SUBJECT TELEPHONE:

        WILSON:     WHAT'S GOOD MEAT?

        MCCLOUD:    I WAS WITH THE NIGGA,YOU KNOW WHAT I SAY, I WANTED
                    YOU TO TELL HIM OVER THE OVER THE OVER THE
                    MICROPHONE WHAT DAT WHAT DAT WHAT STREET THAT WAS.

        WILSON:     WHAT HE [] ACROSS THE STREET?

MCCLOUD: NAW HE HAD JUST LEFT. I WANTED YOU TO TELL HIM YOU KNOW WHAT I'M SAYING CAUSE HE AIN'T HE WASN'T TAKING MY WORD FOR IT SO YOU KNOW WHAT I'M SAYING HE AIN'T GOTTA (I/A) NOBODY BUT YOU.

WILSON: HE WHAT HE DIDN'T WANNA DO WHAT?

MCCLOUD: HE DIDN'T WANNA TAKE MY WORD ON A NUMBER CAUSE HE DIDN'T BELIEVE THAT WAS THE NUMBER THAT YOU SAID AND YOU KNOW WHAT I'M SAYING I WANNA YOUDA YOUDA YOUDA SAY SAY TO THE NIGGA YOU KNOW WHAT I'M SAYING.

WILSON: TELL THE NIGGER TO COME TO THE CRIB.

MCCLOUD: HE HAD TO GO GET HIS DAUGHTER FROM DAY CARE, HE'LL BE BACK OUT HERE LATER.

WILSON: TELL HIM TO COME THROUGH I'LL WORK SOMETHING OUT WITH HIM.

MCCLOUD: AIGHT AIGHT.

WILSON: I'M LOOKING LIME STYLE TOO.

MCCLOUD: WHAT STREET IS IT?

WILSON: TELL HIM TO COME TALK TO ME, I'LL WORK SOMETHING NICE.

MCCLOUD: YOU AT THE CRIB?

WILSON: YEAH, YEAH. AIN'T NOTHIN.. THE NUMBER'S NOT SPECIAL CAUSE IT'S LIME STYLE, I AIN'T GONNA LIE TO YOU.

MCCLOUD: SO WHAT IS IT, I'LL LET YOU KNOW RIGHT NOW.

WILSON: I WON'T SAY.

MCCLOUD: WHAT?

WILSON: I'M NOT GONNA SAY UNTIL UM... SHE HAS CHEDDAR BETTER.

MCCLOUD: OH, I MEAN THAT MAKES A DIFFERENCE?

WILSON: IT JUST MAKES ME A LITTLE MORE EXCITED.

MCCLOUD:  IS THAT WHAT IT IS?

It is the opinion of the monitoring agents, based upon their training and experience and the context of this conversation, and based on consultations with a DEA undercover agent, that the above conversation pertains to a narcotics transaction between WILSON and MCCLOUD, involving an unidentified third party. WILSON encourages MCCLOUD to meet him at SUBJECT PREMISES #1 ("the crib") to work out a deal.  When WILSON tells MCCLOUD that he is "LOOKING LIME STYLE TOO," he is referencing high quality powder cocaine, which makes it easier to cook cocaine into crack cocaine.  The finer and less "stepped on" the powder cocaine is, the better and easier it is to manufacture into crack cocaine.[12] Further, WILSON and MCCLOUD discuss the price ("the street") of the cocaine in these calls, and that the third party is not in total agreement with the price.

## N.    DARYNELL BODDIE

66.    Based on monitoring of intercepted telephone calls to and from the SUBJECT TELEPHONE, intelligence from local law enforcement and a review of documentary evidence, including telephone records, law enforcement officers have determined that the defendant DARYNELL BODDIE is a crack cocaine distributor who is supplied with narcotics by the WILSON ORGANIZATION.

---

[12]    The phrase "stepped on" refers to the dilution of narcotics by adding other, non-narcotic ingredients, which increases the quantity and reduces the purity of the cocaine.

67.  Law enforcement officers have intercepted 55 telephone calls between BODDIE and WILSON using the SUBJECT TELEPHONE.  Based on their training and experience, law enforcement officers believe many of those telephone calls to relate to narcotics transactions, including the following examples:

a.  In March 2007, monitoring agents intercepted a telephone call between BODDIE AND WILSON.  The following is a transcript of the relevant portions of the conversations over the SUBJECT TELEPHONE:

BODDIE:  AH THAT KID THAT KID NUMBER HE DIDNT EVEN ANSWER THATS ALL IT WAS. IT (I/A) TALKING FROM HIM THAT KID NUMBER HE DIDN'T EVEN ANSWER IT AND IT'S LIKE IT'S SAYING YOU KNOW IT'S NOT ACCEPTING CALLS RIGHT NOW OR SOME SHIT.

WILSON:  WHICH ONE? MY BOY?

BODDIE:  YEAH THAT'S WHY I WAS JUST SEEING IF YOU HAD ANOTHER NUMBER. CAUSE I WAS TRYING TO GET OUT THAT WAY MAN I'M HURTIN RIGHT NOW. YA KNOW?

WILSON:  LOOK I KNOW SOMEBODY, HE SAY SOMEBODY CLIMBED THROUGH HIS WINDOW HE HAD A...IT'S GONNA BE A COUPLE OF DAYS.

BODDIE:  WORD?

WILSON:  YEAH, SOMEBODY CLIMBED THROUGH HIS MOTHER FUCKING WINDOW OR SOME SHIT.

BODDIE:  OH MAN. DAMM. (I/A). ALRIGHT BABY

WILSON:  (I/A) I TOLD YOU. UM AH I'LL GET IN TOUCH WITH HIM RIGHT NOW AND SEE WHAT'S UP.

BODDIE:  ALRIGHT WELL HIT ME UP AND LET ME KNOW WHEN OR WHENEVER YOU KNOW WHAT I MEAN?

57

```
WILSON:   OKAY.

BODDIE:   ALRIGHT WORD.
```

It is the opinion of the monitoring agents, based upon their training and experience and the context of this conversation, that BODDIE and WILSON are having a conversation regarding the lack of cocaine available. Specifically, BODDIE is trying to get another number, or another source of supply, from WILSON so that he can purchase cocaine. WILSON tells BODDIE about what happened to his source of supply, LUGO, who was recently robbed. WILSON is referencing a previously intercepted call whereby LUGO and WILSON spoke at length regarding LUGO being robbed of 27 kilograms of cocaine.

      b.   On March 23, 2007, monitoring agents intercepted a conversation between BODDIE and WILSON. The following is a transcript of the relevant portions of the conversations over the SUBJECT TELEPHONE:

```
WILSON:   WHAT'S GOOD?

BODDIE:   MY MAN AH, SAID FIVE, LIKE FIVE O'CLOCK.

WILSON:   WHICH MAN, KEY (KEITH?)?

BODDIE:   NO I'M TALKING ABOUT UM MY MAN, MY MAN. WE WAS
          TALKING ABOUT YESTERDAY.

WILSON:   I DON'T REMEMBER WHICH ONE WE WAS TALKING ABOUT.

BODDIE:   OH MAN (IA) I DON'T KNOW SHIT ABOUT THAT.

WILSON:   WHAT HAPPENED.

BODDIE:   WHEN I SAID I DON'T KNOW SHIT ABOUT THAT.
```

WILSON:    OH OKAY. ALRIGHT, NO PROBLEM.

BODDIE:    YEAH HE SAID FIVE O'CLOCK. YOU KNOW, HE TAKE, YOU
           KNOW?

WILSON:    NO PROBLEM.

BODDIE:    I MEAN WE COMING OUT THERE IN A MINUTE THOUGH..

WILSON:    AH WELL WHAT'S A MINUTE.

BODDIE:    THAT'S WHAT I SAID, FIVE O'CLOCK.

WILSON:    OKAY, ALRIGHT, ALRIGHT UM, SHIT, UM I'M AT THE
           C.I. COURT BUILDING RIGHT NOW, SO WHAT? LIKE
           TWENTY MINUTES?

BODDIE:    AH YEA WE BE OUT THERE BY THEN.

WILSON:    SAY ELEVEN THIRTY.

BODDIE:    ALRIGHT.

WILSON:    ALRIGHT ONE.

The above conversation between WILSON and BODDIE took place at

approximately 10:54 a.m. The conversation involved code

language, which your affiant believes was referencing a cocaine

transaction. Specifically, based on my training and experience,

and based on my knowledge of this investigation, the above call

is coded to avoid law enforcement interception. The phrase

"FIVE O'CLOCK" is repeated throughout the conversation and is

being used to describe an amount. BODDIE keeps saying "FIVE

O'CLOCK," even though he is going to meet WILSON at approximately

11:30 a.m.

        c.   Monitoring agents intercepted a subsequent

conversation between WILSON and BODDIE, which took place at

approximately 12:08 p.m. on March 23, 2007, during which they arrange a meeting location. Based on numerous interceptions, combined with physical surveillance, WILSON is most comfortable when he can physically meet with individuals and conduct his transactions in areas that he is familiar with. This transaction followed that same course. At approximately 12:51 p.m., on March 23, 2007, BODDIE and WILSON met on a block adjacent to Little East Neck Road. WILSON directed BODDIE to a particular location and had BODDIE pull over, where a meeting took place.

## IV. PROBABLE CAUSE TO SEARCH THE SUBJECT PREMISES:

### A. Evidence Commonly Found at Residences of Drug Traffickers

68. Based on my training, experience, participation in other drug investigations, execution of search warrants, debriefing of confidential sources and extensive discussions with other experienced law enforcement officers, I am familiar with how various drugs are used and the typical distribution and trafficking methods used by drug dealers and traffickers.

69. In a substantial number of residential and commercial searches executed in connection with drug investigations, the following kinds of drug-related evidence have typically been recovered:

a. Members of drug organizations often maintain close at hand the addresses, telephone and pager numbers of their criminal associates, including information pertaining to their

sources of supply and customers, in address books, electronic organizers and on other pieces of paper.

b.   Telephone bills and records of calls to telephones and pagers are also maintained for lengthy periods of time in defendants' homes.  Such records constitute important corroborative evidence in drug conspiracy cases because the defendants call one another regularly, especially just before and after an incident involving an act committed in furtherance of the conspiracy.

c.   Drug traffickers frequently maintain in their residences or stash locations quantities of controlled substances.  They also maintain paraphernalia for packaging and distributing controlled substances, such as scales, plastic bags, heat-seal devices, and other items.  Additionally, crack cocaine traffickers frequently maintain in their residences or stash locations equipment and utensils for the purpose of manufacturing, or "cooking," powder cocaine into crack cocaine.

d.   Drug traffickers frequently maintain books, records, receipts, notes, ledgers, and other documents relating to the ordering, sale and distribution of drugs. Such documents are generally maintained where the traffickers have ready access to them, such as the traffickers' residences.

e.   Drug traffickers frequently maintain financial records evidencing the deposit and transfer of monies in their

homes. Such documents are generally maintained where the traffickers have ready access to them, such as the traffickers' residences.

70. Based upon my training and experience, as well as my discussions with other law enforcement officers, I am aware that it is generally a common practice for drug traffickers to maintain in their residences records relating to their drug trafficking activities. Because drug traffickers will "front" (that is, sell on consignment) controlled substances to their clients, or alternatively, will be "fronted" controlled substances for their suppliers, such record-keeping is necessary to keep track of amounts paid and owed, and such records will also be maintained close at hand so as to readily ascertain current balances. Often drug traffickers keep "pay and owe" records to show balances due for drugs sold in the past ("pay") and for payments expected ("owe") as to the trafficker's supplier and the trafficker's dealer(s). Additionally, drug traffickers must maintain telephone and address listings of clients and suppliers and keep them immediately available in order to efficiently conduct their trafficking business. In addition, because drug transactions are done with cash, frequently drug traffickers have large quantities of United States currency, reflecting money used to pay for drugs, or representing the proceeds from sales thereof.

71. It is also a generally common practice for traffickers to conceal at their residences large sums of money, either the proceeds from drug sales or monies to be used to purchase controlled substances. In this connection, drug traffickers typically make use of wire transfers, cashier's checks, and money orders to pay for controlled substances. Evidence of such financial transactions and records relating to income and expenditures of money and wealth in connection with drug trafficking would also typically be maintained in residences and/or offices.

72. Further, I know, from both my professional and personal experiences, that people often maintain their cellular telephones in their residences.

73. Based upon my training, experience and participation in narcotics investigations, distributors of narcotics commonly conceal narcotics, narcotics proceeds, and related records in closed containers such as closets, boxes or safes in their residences and places of operation.

**B.    SUBJECT PREMISES #1-95 South 24th Street, Wyandanch, New York**

74. SUBJECT PREMISES #1 is the primary residence of the defendant FRANK WILSON, a main target of this investigation. As set forth more fully above, WILSON is a large-scale crack cocaine and cocaine dealer operating in the Wyandanch, New York

community and he is the leader of the WILSON ORGANIZATION.  <u>See</u> ¶¶ 16-22, <u>supra</u>.

75.   SUBJECT PREMISES #1 is a one-story, single family house located on the east side of South 24th Street, Wyandanch, New York.  SUBJECT PREMISES #1 is a beige and brick house with a grey roof.  SUBJECT PREMISES #1 has an attached garage on the north side of the house and a covered porch on the front of the house.  A photograph of SUBJECT PREMISES #1 is attached hereto as Exhibit C-1.

76.   A review of real property records for SUBJECT PREMISES #1 indicates that it was previously owned by WILSON.  On or about July 5, 2001, WILSON transferred the residence to himself and his sister, JOAN WILSON.  On or about July 30, 2004, the property was again transferred to SONYA MCBEE, who is WILSON's girlfriend.  On or about November 8, 2005, MCBEE transferred the property to herself and WILSON (Joan) as tenants in common.

77.   In addition to being WILSON's primary residence, the investigation has determined that SUBJECT PREMISES #1 is integral to the operation of the WILSON ORGANIZATION.  Numerous confidential sources, including CS-3, CS-6, CS-12 and CS-24, have indicated that WILSON stores narcotics at SUBJECT PREMISES #1 and have conducted narcotics transactions either in SUBJECT PREMISES #1 or adjacent thereto.

78. For example, CS-6 informed law enforcement that he/she has accompanied WILSON to the Bronx to purchase cocaine and that, after WILSON cooked the cocaine into crack cocaine at SUBJECT PREMISES #9 and left approximately 30 pieces of crack cocaine, worth about $40 each at SUBJECT PREMISES #9, WILSON brought the rest with him to SUBJECT PREMISES #1 for storage. Additionally, CS-6 estimated that he/she has been with WILSON when he re-supplied the crack house at SUBJECT PREMISES #9, with crack cocaine from SUBJECT PREMISES #1, 30 to 40 times. Further, CS-6 stated that he/she has been inside SUBJECT PREMISES #1 more than a dozen times and has seen WILSON remove a bag with crack cocaine from the garage of SUBJECT PREMISES #1.

79. Further, during the course of this investigation, law enforcement officers have conducted physical surveillance, which in connection with the monitoring of intercepted communications and information from confidential sources reveals that narcotics transactions have occurred at SUBJECT PREMISES #1. For example, as set forth above, on April 18, 2007, monitoring agents intercepted communications and conducted surveillance of SUBJECT PREMISES #1, which revealed that LUGO, WILSON's source of supply from the Bronx, traveled to Wyandanch to meet with WILSON at SUBJECT PREMISES #1. It is the opinion of the monitoring agents, based on their training and experience and the context of the conversations on April 18, 2007 and physical surveillance,

that LUGO and WILSON conducted a narcotics transaction at SUBJECT PREMISES #1 on that date. *See* ¶¶ 25-26, *supra*.

80. Additionally, a number of confidential sources, including CS-6, CS-12 and CS-14, have observed WILSON with firearms, including a semi-automatic handgun, a revolver and a rifle, at SUBJECT PREMISES #1 and elsewhere on numerous occasions. Accordingly, your deponent believes that firearms are likely to be recovered from SUBJECT PREMISES #1, which would constitute evidence of violations of Title 18, United States Code, Section 924(c).

81. SUBJECT PREMISES #1 is associated with WILSON, for whom your deponent is seeking an arrest warrant in connection with a conspiracy to distribute and possess with intent to distribute crack cocaine and cocaine. Moreover, as set forth above, with regard to SUBJECT PREMISES #1, there is probable cause to believe that the items (1)-(8) described in Exhibit B attached hereto, which constitute evidence, fruits and instrumentalities of violations of Title 21, United States Code, Sections 841(a)(1) and 846 and Title 18, United States Code, Sections 924(c) and 1956, will be kept at SUBJECT PREMISES #1.

### C. SUBJECT PREMISES #2-72 Centerwood Street, North Babylon, New York

82. SUBJECT PREMISES #2 is the primary residence of the defendant RENARD HOLDER, a main target of this investigation. As set forth more fully above, HOLDER is a large-scale crack

66

cocaine and cocaine dealer operating in the Wyandanch, New York community and he is a close associate of WILSON, the leader of the WILSON ORGANIZATION. See ¶¶ 27-28, supra.

83. SUBJECT PREMISES #2 is a two-story, single family house located at 72 Centerwood Street in North Babylon, New York. SUBJECT PREMISES #2 has green shingled siding, a brown roof and a brown front door. SUBJECT PREMISES #2 has an attached garage with a porch on top and a large tree on the west side of the front yard. A photograph of SUBJECT PREMISES #2 is attached hereto as Exhibit C-2.

84. A review of real property records for SUBJECT PREMISES #2 indicates that HOLDER is the owner. Additionally, during the course of the investigation, law enforcement officers conducting physical surveillance have observed HOLDER at SUBJECT PREMISES #2 on numerous occasions at different times of day.

85. On or about April 3, 2007, CS-20 was in SUBJECT PREMISES #2 and observed a number of items, which constitute evidence of drug trafficking. Specifically, CS-20 observed the following items: (a) a "large chunk of cocaine;" (b) a large electronic safe in an upstairs bedroom; (c) a large plastic bag with crack cocaine; (d) a black assault rifle; and (e) a digital scale. On that date, HOLDER was also observed armed with a silver .357 revolver.

86. Further, CS-20 stated that he/she had observed numerous weapons, including the aforementioned .357 revolver and black assault rifle and a shotgun, crack cocaine and large amounts of currency at SUBJECT PREMISES #2 on prior occasions. Accordingly, your deponent believes that firearms are likely to be recovered from SUBJECT PREMISES #2, which would constitute evidence of violations of Title 18, United States Code, Section 924(c).

87. SUBJECT PREMISES #2 is associated with HOLDER, for whom your deponent is seeking an arrest warrant in connection with a conspiracy to distribute and possess with intent to distribute crack cocaine and cocaine. Moreover, as set forth above, with regard to SUBJECT PREMISES #2, there is probable cause to believe that the items (1)-(8) described in Exhibit B attached hereto, which constitute evidence, fruits and instrumentalities of violations of Title 21, United States Code, Sections 841(a)(1) and 846 and Title 18, United States Code, Sections 924(c) and 1956, will be kept at SUBJECT PREMISES #2.

**D.  SUBJECT PREMISES #3-89 New Avenue, Wyandanch, New York**

88. SUBJECT PREMISES #3 is a property co-owned by HOLDER, a main target of this investigation. As set forth more fully above, HOLDER is a large-scale crack cocaine and cocaine dealer operating in the Wyandanch, New York community and he is a

close associate of WILSON, the leader of the WILSON ORGANIZATION. See ¶¶ 27-28, _supra_.

89. SUBJECT PREMISES #3 is a two-story, single family house located at 89 New Avenue, Wyandanch, New York, which is currently being renovated. SUBJECT PREMISES #3 has grey siding and two small dormers on the second floor. There is a chain link fence surrounding the property. A photograph of SUBJECT PREMISES #2 is attached hereto as Exhibit C-3.

90. A review of real property records for SUBJECT PREMISES #3 indicates that it is owned by an individual named Jaime Cowan. However, CS-20 has informed law enforcement officers that SUBJECT PREMISES #3 is co-owned by HOLDER. Additionally, during the course of the investigation, law enforcement officers conducting physical surveillance have observed HOLDER at SUBJECT PREMISES #3 on numerous occasions.

91. Further, CS-20 stated that he/she was at SUBJECT PREMISES #3 during the week of April 2, 2007. At that time, CS-20 observed two large bags of crack cocaine in a crawl space at SUBJECT PREMISES #3. HOLDER told CS-20 that he was hiding the crack cocaine in the crawl space because "the Feds" were watching him.

92. SUBJECT PREMISES #3 is associated with HOLDER, for whom your deponent is seeking an arrest warrant in connection with a conspiracy to distribute and possess with intent to

distribute crack cocaine and cocaine. Moreover, as set forth above, with regard to SUBJECT PREMISES #3, there is probable cause to believe that the items (1)-(7) described in Exhibit B attached hereto, which constitute evidence, fruits and instrumentalities of violations of Title 21, United States Code, Sections 841(a)(1) and 846 and Title 18, United States Code, Section 1956, will be kept at SUBJECT PREMISES #3.

### E. SUBJECT PREMISES #4-98 North 18th Street, Wyandanch, New York

93. SUBJECT PREMISES #4 is the primary residence of the defendant MELVIN TUCKER. As set forth more fully above, TUCKER is a significant member of the WILSON ORGANIZATION. In addition to selling crack cocaine for WILSON, TUCKER is WILSON's primary "chef," who manufactures, or "cooks," powder cocaine into crack cocaine. See ¶¶ 37-39, supra.

94. SUBJECT PREMISES #4 is a two-story, single family, cape-style house located at 98 North 18th Street, Wyandanch, New York. SUBJECT PREMISES #4 has beige colored siding, a grey roof, and a brown front door with a concrete stoop. SUBJECT PREMISES #4 has a driveway located on the south side of the house. A photograph of SUBJECT PREMISES #4 is attached hereto as Exhibit C-4.

95. SUBJECT PREMISES #4 is occupied by TUCKER, in addition to other individuals. During the course of this investigation, law enforcement officers conducting physical

70

surveillance have observed TUCKER at SUBJECT PREMISES #4 on numerous occasions at different times of day. Additionally, when he was stopped for a traffic violation, TUCKER stated that he lived at SUBJECT PREMISES #4.

96. Additionally, during the course of this investigation, monitoring agents have intercepted numerous telephone calls between TUCKER and WILSON in order to set up meetings at SUBJECT PREMISES #4, which, based upon the interceptions and information provided by confidential sources, are believed to have involved the exchange of crack cocaine and/or proceeds from the sale of crack cocaine between WILSON and TUCKER. For example, on March 1, 2007, monitoring agents intercepted a call between TUCKER and WILSON, during which TUCKER told WILSON, "I NEED TO SEE YOU AGAIN" and that he [TUCKER] was at "18." WILSON told TUCKER he would be there in "FIVE MINUTES." It is the opinion of the monitoring agents, based upon their training and experience and the context of this conversation and others that TUCKER is asking WILSON to deliver crack cocaine to him at SUBJECT PREMISES #4, which is referred to as "18."

97. Further, CS-14 was interviewed by law enforcement officers on April 19, 2007. CS-14 stated that, as of that date, TUCKER was continuing to live at SUBJECT PREMISES #4 and TUCKER was dealing crack cocaine at that location.

98. Additionally, CS-14 stated that he/she had seen an unidentified male at SUBJECT PREMISES #4 with a black handgun on approximately eight occasions. Accordingly, your deponent believes that firearms are likely to be recovered from SUBJECT PREMISES #4, which would constitute evidence of violations of Title 18, United States Code, Section 924(c).

99. SUBJECT PREMISES #4 is associated with TUCKER, for whom your deponent is seeking an arrest warrant in connection with a conspiracy to distribute and possess with intent to distribute crack cocaine and cocaine. Moreover, as set forth above, with regard to SUBJECT PREMISES #4, there is probable cause to believe that the items (1)-(8) described in Exhibit B attached hereto, which constitute evidence, fruits and instrumentalities of violations of Title 21, United States Code, Sections 841(a)(1) and 846 and Title 18, United States Code, Sections 924(c) and 1956, will be kept at SUBJECT PREMISES #4.

## F. SUBJECT PREMISES #5-4 Carriage Court, Dix Hills, New York

100. As set forth more fully above, SUBJECT PREMISES #5 is known to be a "crack house," which is supplied with crack cocaine by the WILSON ORGANIZATION. The SCPD has made numerous arrests, of both occupants of SUBJECT PREMISES #5 and individuals leaving SUBJECT PREMISES #5, for narcotics offenses. Further, during the course of this investigation, WILSON, NEWCOMBE, ARENA

and others, have sold crack cocaine at SUBJECT PREMISES #5. See ¶¶ 11, 42-46 and 55-57, supra.

101. SUBJECT PREMISES #5 is a one-story, single family house located on a cul-de-sac at 4 Carriage Court, Dix Hills, New York. SUBJECT PREMISES #5 is situated on a large parcel of land and has brown shingles, a dark colored roof and a covered porch on the front of the house. SUBJECT PREMISES #5 has a long driveway on the south side of the house. A photograph of SUBJECT PREMISES #5 is attached hereto as Exhibit C-5.

102. A review of real property records for SUBJECT PREMISES #5 indicates that JOANNE SARNIK is the owner of the SUBJECT PREMISES. SARNIK was previously married to JOHN MCGINNIS, also known as "Pops." MCGINNIS was a crack cocaine dealer and a target of this investigation until he died on April 11, 2007. MCGINNIS suffered a massive heart attack on April 8, 2007 after smoking crack cocaine at SUBJECT PREMISES #5.

103. Additionally, based on physical surveillance and intercepted wire communications from the SUBJECT TELEPHONE, law enforcement officers are aware that NEWCOMBE and ARENA have lived at SUBJECT PREMISES #5 for periods of time during this investigation and that ARENA still lives there.

104. In addition to being used as a "crack house," supplied by the WILSON ORGANIZATION, SUBJECT PREMISES #5 has been the site of numerous narcotics transactions during the

investigation. Specifically, numerous confidential sources, including CS-3, CS-12, CS-24 and CS-25, have purchased crack cocaine at SUBJECT PREMISES #5. Further, those sources have indicated that WILSON stores narcotics at SUBJECT PREMISES #5 and that information has been corroborated by wire intercepts during this investigation. Specifically, monitoring agents intercepted a conversation between NEWCOMBE and WILSON, which revealed that WILSON keeps a safe at SUBJECT PREMISES #5 with crack cocaine contained therein.

105. SUBJECT PREMISES #5 is associated with ARENA, WILSON and NEWCOMBE, for whom your deponent is seeking arrest warrants in connection with a conspiracy to distribute and possess with intent to distribute crack cocaine and cocaine. Moreover, as set forth above, with regard to SUBJECT PREMISES #5, there is probable cause to believe that the items (1)-(7) described in Exhibit B attached hereto, which constitute evidence, fruits and instrumentalities of violations of Title 21, United States Code, Sections 841(a)(1) and 846 and Title 18, United States Code, Section 1956, will be kept at SUBJECT PREMISES #5.

### G. SUBJECT PREMISES #6-45 Bedford Street, Wyandanch, New York

106. SUBJECT PREMISES #6 is a residence of the defendant LORENZO WARREN, a significant target of this investigation. As set forth more fully above, WARREN is a crack

cocaine and cocaine dealer operating in the Wyandanch, New York community and he is a close associate of WILSON, the leader of the WILSON ORGANIZATION. See ¶¶ 33-36, supra.

107. SUBJECT PREMISES #6 is a one-story, "L-shaped," single family house located at 45 Bedford Street, Wyandanch, New York, on the corner of Birch Street and Bedford Street. SUBJECT PREMISES #6 has beige and a white front door, with the number "45" on the door. A photograph of SUBJECT PREMISES #6 is attached hereto as Exhibit C-6.

108. Based on physical surveillance, wire intercepts and information provided by CS-21, law enforcement officers have determined that WARREN lives at SUBJECT PREMISES #6.

109. Further, monitoring agents have intercepted conversations between WILSON and WARREN indicating that they have conducted narcotics transactions at SUBJECT PREMISES #6. For example, on April 17, 2007, WILSON and WARREN agreed to meet at SUBJECT PREMISES #6. Based on physical surveillance and subsequent information provided by CS-21, WILSON supplied WARREN with crack cocaine on that date.

110. Additionally, CS-21 has observed WARREN with a black 9mm handgun on multiple occasions. WARREN informed CS-21 that he had a license to possess the gun. Another confidential source, CS-23, was at SUBJECT PREMISES #6 on March 19, 2007 and observed a black-colored handgun in plain view. CS-23 also

observed an unidentified individual, known to CS-23 as "Black," with a handgun at SUBJECT PREMISES #6. Accordingly, your deponent believes that firearms are likely to be recovered from SUBJECT PREMISES #6, which would constitute evidence of violations of Title 18, United States Code, Section 924(c).

111. SUBJECT PREMISES #6 is associated with WARREN, for whom your deponent is seeking an arrest warrant in connection with a conspiracy to distribute and possess with intent to distribute crack cocaine and cocaine. Moreover, as set forth above, with regard to SUBJECT PREMISES #6, there is probable cause to believe that the items (1)-(8) described in Exhibit B attached hereto, which constitute evidence, fruits and instrumentalities of violations of Title 21, United States Code, Sections 841(a)(1) and 846 and Title 18, United States Code, Sections 924(c) and 1956, will be kept at SUBJECT PREMISES #6.

**H.    SUBJECT PREMISES #7-3 Buchanan Avenue, Copaigue, New York**

112. As set forth more fully below, SUBJECT PREMISES #7 is a house that is used by the WILSON ORGANIZATION to manufacture, or "cook," powder cocaine into crack cocaine. Based on wire intercepts and information provided by confidential sources, members of the WILSON ORGANIZATION refer to SUBJECT PREMISES #7 by the code word "Melrose."

113. SUBJECT PREMISES #7 is a two-story, A-frame, single family house located at 3 Buchanan Avenue, Copaigue, New

York.  SUBJECT PREMISES #7 has brick facade, a cement front porch and a grey roof.  SUBJECT PREMISES #2 has an attached garage and the property is surrounded by a chain-link fence.  A photograph of SUBJECT PREMISES #7 is attached hereto as Exhibit C-7.

114.  On September 25, 2006, SUBJECT PREMISES #7 was damaged by a fire.  While at the scene of the fire, a SCPD police officer was approached by an individual who identified himself as FRANK WILSON, who informed the officer that WILSON was the co-owner and caretaker of SUBJECT PREMISES #7.[13]  CS-24 has confirmed that WILSON owns SUBJECT PREMISES #7.  Further, monitoring agents have intercepted conversations between WILSON and an insurance company wherein he attempts to negotiate a settlement in connection with said fire.

115.  Additionally, when they responded to the aforementioned fire, SCPD police officers observed two digital scales, a metal strainer and small plastic bags located in the kitchen of SUBJECT PREMISES #7.  Based on my training and experience, such items are consistent with the manufacturing, or "cooking," of crack cocaine.

116.  Recent wire interceptions and physical surveillance indicate that NEWCOMBE has been living at SUBJECT

---

[13]  The registered owner of SUBJECT PREMISES #7 is Luis Maldonado, who is believed to be a "straw owner."

PREMISES #7 for several weeks. As set forth above, NEWCOMBE previously resided at SUBJECT PREMISES #5.

117. Further, CS-24 was interviewed on March 23, 2007 and informed law enforcement that WILSON transports powder cocaine to SUBJECT PREMISES #7, where he, assisted by other members of his organization, usually TUCKER, cooks the powder cocaine into crack cocaine. CS-24 had observed WILSON and TUCKER manufacturing crack cocaine at SUBJECT PREMISES #7 as recently as late February 2007. CS-24 stated that WILSON usually waits at SUBJECT PREMISES #7 while TUCKER cooks, but sometimes TUCKER will cook the crack cocaine and deliver it to WILSON at SUBJECT PREMISES #1.

118. Still further, CS-14 was interviewed on April 19, 2007 and informed law enforcement that he/she had purchased crack cocaine from WILSON at SUBJECT PREMISES #7 in early April 2007.

119. SUBJECT PREMISES #7 is associated with WILSON and NEWCOMBE, for whom your deponent is seeking arrest warrants in connection with a conspiracy to distribute and possess with intent to distribute crack cocaine and cocaine. Moreover, as set forth above, with regard to SUBJECT PREMISES #7, there is probable cause to believe that the items (1)-(7) described in Exhibit B attached hereto, which constitute evidence, fruits and instrumentalities of violations of Title 21, United States Code,

Sections 841(a)(1) and 846 and Title 18, United States Code, Section 1956, will be kept at SUBJECT PREMISES #7.

I. **SUBJECT PREMISES #8-56 Spruce Street, Wyandanch, New York**

120. SUBJECT PREMISES #8 is the primary residence of the defendant HAYWOOD MITCHELL, a significant target of this investigation. As set forth more fully above, MITCHELL is a large-scale crack cocaine and cocaine dealer operating in the Wyandanch, New York community and he is a close associate of WILSON, the leader of the WILSON ORGANIZATION. See ¶¶ 29-32, supra.

121. SUBJECT PREMISES #8 is a two-story, single family house located at 56 Spruce Street, Wyandanch, New York. SUBJECT PREMISES #8 has white stucco and beige siding, a white stoop and a white front door. The number "56" is clearly visible adjacent to the front door. SUBJECT PREMISES #8 has a side entrance located on the south side of the property. A photograph of SUBJECT PREMISES #8 is attached hereto as Exhibit C-8.

122. Based on wire intercepts and physical surveillance, conducted on a number of occasions and at various times of day, MITCHELL resides at SUBJECT PREMISES #8.

123. As set forth above, on April 9, 2007, MITCHELL was observed in the Bronx meeting with an individual believed to be either LUGO or an associate of LUGO, the cocaine source of supply for the WILSON ORGANIZATION. Law enforcement officers

79

continued surveillance of MITCHELL later that evening and observed the same vehicle MITCHELL was driving in the Bronx, parked outside of SUBJECT PREMISES #8.

124. As discussed above, law enforcement officers have determined that MITCHELL lives at SUBJECT PREMISES #8. As such, I believe that MITCHELL's cellular telephone, which he used to communicate with WILSON will be recovered there, as well as other telephones and records with the names, addresses and telephone numbers that MITCHELL may have used to contact WILSON and other conspirators. Moreover, I believe that billing records related to the use of these telephones by MITCHELL are likely to be recovered from his home, which would provide crucial corroborative evidence of the intercepted communications. Further, law enforcement officers have determined that MITCHELL drove the CRV to the Bronx in order to purchase narcotics from LUGO. Thus, I believe that motor vehicle records, including financial records document payments made on that vehicle will be recovered from SUBJECT PREMISES #8.

125. SUBJECT PREMISES #8 is associated with MITCHELL, for whom your deponent is seeking an arrest warrant in connection with a conspiracy to distribute and possess with intent to distribute crack cocaine and cocaine. Moreover, as set forth above, with regard to SUBJECT PREMISES #8, there is probable cause to believe that the items (3)-(5) described in Exhibit B

attached hereto, which constitute evidence, fruits and instrumentalities of violations of Title 21, United States Code, Sections 841(a)(1) and 846 and Title 18, United States Code, Section 1956, will be kept at SUBJECT PREMISES #8.

**J.  SUBJECT PREMISES #9-105 Irving Avenue, Wyandanch, New York**

126.  As set forth more fully above, SUBJECT PREMISES #9 is known to be a "crack house," which is owned by BLORE, supplied with crack cocaine by WILSON and operated by MAXWELL. Specifically, numerous confidential sources, including without limitation CS-1, CS-4, CS-5, CS-6, CS-7, CS-8, CS-10, CS-14 and CS-24, have identified SUBJECT PREMISES #9 as a "crack house" supplied by the WILSON ORGANIZATION.

127.  Further, based on wire intercepts and physical surveillance, WILSON and MAXWELL, among others, have sold crack cocaine at SUBJECT PREMISES #9 during the course of this investigation.  Based on wire intercepts and information provided by confidential sources, members of the WILSON ORGANIZATION refer to SUBJECT PREMISES #9 by the code word "Section 8."

128.  SUBJECT PREMISES #9 is a single family, A-Frame house located at 105 Irving Avenue, Wyandanch, New York.  SUBJECT PREMISES #9 has yellow siding, a grey roof and a white front door.  A photograph of SUBJECT PREMISES #9 is attached hereto as Exhibit C-9.

129.   A review of real property records for SUBJECT PREMISES #9 indicates that BLORE is the current owner of the SUBJECT PREMISES.   Further, based on information provided by confidential sources, wire intercepts and physical surveillance, law enforcement officers have learned that MAXWELL has resided at SUBJECT PREMISES #9 and is responsible for running the "crack house."

130.   In addition to being used as a "crack house," supplied by the WILSON ORGANIZATION, SUBJECT PREMISES #9 has been the site of numerous narcotics transactions during the investigation and has been used to manufacture, or "cook," crack cocaine.   For example, CS-6 informed law enforcement that he/she accompanied WILSON to the Bronx to purchase cocaine and when they returned they went to SUBJECT PREMISES #9, where WILSON cooked the cocaine into crack cocaine.   On that occasion, WILSON left approximately 30 pieces of crack cocaine, worth about $40 each at SUBJECT PREMISES #9 and took the rest with him to SUBJECT PREMISES #1 for storage.   Additionally, CS-6 estimated that been with WILSON when he re-supplied SUBJECT PREMISES #9 with crack cocaine 30 to 40 times.

131.   Further, numerous confidential sources, including CS-12, CS-24 and CS-25, have purchased crack cocaine at SUBJECT

PREMISES #9.  Those sources have indicated that WILSON has stored narcotics at SUBJECT PREMISES #9 in a safe in the past.[14]

132.  SUBJECT PREMISES #9 is associated with WILSON, MAXWELL and BLORE for whom your deponent is seeking arrest warrants in connection with a conspiracy to distribute and possess with intent to distribute crack cocaine and cocaine. Moreover, as set forth above, with regard to SUBJECT PREMISES #9, there is probable cause to believe that the items (1)-(7) described in Exhibit B attached hereto, which constitute evidence, fruits and instrumentalities of violations of Title 21, United States Code, Sections 841(a)(1) and 846 and Title 18, United States Code, Section 1956, will be kept at SUBJECT PREMISES #9.

## K.    SUBJECT PREMISES #10-11 Lilmar Place Islip Terrace, New York

133.  SUBJECT PREMISES #10 is the primary residence of BLORE, an important member of the WILSON ORGANIZATION.  As set forth more fully above, BLORE is a financial facilitator for WILSON and his organization.  Specifically, WILSON registers his cars (both owned and rented) in BLORE's name and SUBJECT PREMISES #9, which is owned by WILSON, is in BLORE's name.  Additionally, BLORE maintains bank accounts and credit cards on behalf of

---

[14]    Monitoring agents intercepted a conversation between WILSON and MAXWELL wherein they discussed removing the safe from SUBJECT PREMISES #9.  However, it is not clear whether that safe was subsequently removed.

WILSON, who provides her with cash in order to pay such bills and expenses. See ¶¶ 47-54, supra.

134. SUBJECT PREMISES #10 is a two-story, high-ranch, single family house located at 11 Lilmar Place, Islip Terrace, New York. SUBJECT PREMISES #10 has brown siding and an attached two-car garage with two white garage doors with large black hinges. SUBJECT PREMISES #10 has a brown roof, a white front door and a concrete stoop leading up to the front door. A photograph of SUBJECT PREMISES #10 is attached hereto as Exhibit C-10.

135. Based on physical surveillance and public records searches, law enforcement officers have determined that BLORE resides at SUBJECT PREMISES #10 with her family. SUBJECT PREMISES #10 is believed to be owned by BLORE's parents, Thomas and Ann Blore.

136. As set forth above, BLORE is a financial facilitator for the WILSON ORGANIZATION. Specifically, BLORE registers vehicles in her name for WILSON including the BMW, 300M, EXPLORER, PONTIAC, HYUNDAI and TAURUS. Further, while WILSON is believed to exercise control over SUBJECT PREMISES #9, that property is held in BLORE's name.

137. During the course of this investigation, monitoring agents have intercepted hundreds of telephone calls between WILSON and BLORE, which conversations relate to the

84

payment of bills and WILSON providing BLORE with money.  More
particularly, WILSON is believed to provide BLORE with cash and
she pays various bills including car payments, rental car
payments, credit card bills and mortgage payments.

138.  Based on the foregoing, your affiant believes
that billing records related to vehicles, credit cards and real
property are likely to be recovered from SUBJECT PREMISES #10,
which would provide crucial corroborative evidence.  Furthermore,
your affiant believes that personal records, such as the names,
addresses and telephone numbers of the co-conspirators would be
likely to be recovered from SUBJECT PREMISES #10.  In addition,
as SUBJECT PREMISES #10 is BLORE's residence, I believe that
financial records related to the WILSON ORGANIZATION's narcotics
trafficking are likely to be recovered.  Finally, based on my
professional and personal experience, billing records are an item
that individuals retain for long periods of time for record-
keeping purposes.

139.  SUBJECT PREMISES #10 is associated with BLORE,
for whom your deponent is seeking an arrest warrant in connection
with a conspiracy to distribute and possess with intent to
distribute crack cocaine and cocaine.  Moreover, as set forth
above, with regard to SUBJECT PREMISES #10, there is probable
cause to believe that the items (4)-(7) described in Exhibit B
attached hereto, which constitute evidence, fruits and

instrumentalities of violations of Title 21, United States Code, Sections 841(a)(1) and 846 and Title 18, United States Code, Section 1956, will be kept at SUBJECT PREMISES #10.

### L. SUBJECT PREMISES #11-28 Jamaica Avenue, Wyandanch, New York

140. SUBJECT PREMISES #11 is the primary residence of LEVAR BUTTS, a target of this investigation. BUTTS is a crack cocaine and cocaine dealer operating in the Wyandanch, New York community and he is a close associate of WILSON, the leader of the WILSON ORGANIZATION.

141. SUBJECT PREMISES #11 is a two-story, single family house located at 28 Jamaica Avenue, Wyandanch, New York. SUBJECT PREMISES #11 has brown shingles on the front of the house with lighter colored shingles on the sides. SUBJECT PREMISES #11 has a brown double-doors in the front of the house and a driveway on the east side of the property. A photograph of SUBJECT PREMISES #11 is attached hereto as Exhibit C-11.

142. BUTTS is believed to reside at SUBJECT PREMISES #11 based on physical surveillance and information from CS-12. During the course of the investigation, law enforcement officers have observed BUTTS at SUBJECT PREMISES #11 on numerous occasions at different times of day. On one occasion, BUTTS was observed getting mail out of the mail box of SUBJECT PREMISES #11. Further, CS-12 informed law enforcement officers that BUTTS resides at SUBJECT PREMISES #11.

86

143. During the investigation, law enforcement has determined that BUTTS is engaged in the distribution of crack cocaine from a number of sources, including wire intercepts, physical surveillance and information from confidential sources. Further, information from CS-3 reveals that BUTTS conducts the sale of crack cocaine from SUBJECT PREMISES #11. Specifically,

144. Specifically, on January 30, 2007, CS-12 was interviewed by law enforcement officers. CS-12 identified WILSON as one of the largest crack cocaine dealers in Wyandanch. Further, CS-12 stated that WILSON supplies BUTTS with crack cocaine and that BUTTS is a "decent sized" drug dealer in the Wyandanch area. Further, CS-12 stated that WILSON had delivered as much as three and one-half ounces [approximately 100 grams] of crack cocaine to BUTTS at a time.

145. Additionally, on April 27, 2007, CS-3 informed law enforcement officers that he/she purchases crack cocaine from an individual known to as "LV." CS-3 identified a photograph of BUTTS as the person he/she knows as "LV." CS-3 estimated that he/she had purchased crack cocaine from BUTTS at least 30 times since November 2006 in amounts ranging from three to ten grams.

146. Significantly, CS-3 stated he/she made all but one of the 30 aforementioned purchases of crack cocaine from BUTTS at SUBJECT PREMISES #11.

147. Law enforcement officers have intercepted 30 telephone calls between BUTTS and WILSON using the SUBJECT TELEPHONE. Based on their training and experience, law enforcement officers believe many of those telephone calls to relate to narcotics transactions, including the following example:

a. On March 19, 2007, monitoring agents intercepted a conversation between BUTTS and WILSON. The following is a transcript of the relevant portion of the conversation over the SUBJECT TELEPHONE:

BUTTS:      WHAT UP?

WILSON:     WHAT'S GOOD NIGGER?

BUTTS:      YO YOU GOT THAT, THAT LEANING?

WILSON:     OH WHAT YOU.......

BUTTS:      (I/A)

WILSON:     YEAH WHATEVER, YOU KNOW. I'M AROUND. COME TALK TO ME

BUTTS:      YOU AT THE CRIB?

WILSON:     YEAH, WHERE YOU AT?

BUTTS:      I'M IN A HURRY, I'M GONNA COME OVER THERE RIGHT NOW.

WILSON:     ALRIGHT.

It is the opinion of the monitoring agents, based upon their training and experience and the context of this conversation, that BUTTS called to order up crack cocaine and went by SUBJECT

PREMISES #1 to pick it up. In this and in other conversations, BUTTS utilizes the same techniques that other co-conspirators utilize in this investigation to order up the crack cocaine from WILSON. BUTTS tells WILSON that he is "coming over," "I'll be right there" or "I'm jumpin out." Further, based on other wire intercepts and physical surveillance, monitoring agents determined that HOLDER traveled to the Bronx to pick up cocaine from LUGO earlier that day, March 19, 2007, to resupply the WILSON ORGANIZATION and its customers.

148. SUBJECT PREMISES #11 is associated with BUTTS, who is believed to be associated with a conspiracy to distribute and possess with intent to distribute crack cocaine and cocaine. Moreover, as set forth above, with regard to SUBJECT PREMISES #11, there is probable cause to believe that the items (1)-(7) described in Exhibit B attached hereto, which constitute evidence, fruits and instrumentalities of violations of Title 21, United States Code, Sections 841(a)(1) and 846 and Title 18, United States Code, Section 1956, will be kept at SUBJECT PREMISES #11.

**V.  CONCLUSION:**

WHEREFORE, your deponent respectfully requests that arrest warrants be issued for the defendants FRANK WILSON, also known as "Big Banana," and "Frankie B" and "Los,", CARLOS LUGO, also known as "Ricardo Campana-Herrera," RENARD HOLDER, also

known as "Von" and "Bananalito," HAYWOOD MITCHELL, also known as "Beano" and "Queen B," LORENZO WARREN, also known as "Lo," MELVIN TUCKER, also known as "Tuck," DARYL GRICE, also known as "Nick Nack," DENISE NEWCOMBE, MARIE BLORE, JAMES ARENA, CASANDRA MAXWELL, also known as "KK," ASHANTI HARRELL, also known as "Footie," LEONARD MCCLOUD and DARYNELL BODDIE, so that they may be dealt with according to law.

WHEREFORE, your deponent also respectfully request that search warrants be issued, pursuant to Rule 41 of the Federal Rules of Criminal Procedure, authorizing agents of the DEA and other law enforcement officers, to search each of the SUBJECT PREMISES, and therein to seize the items described on Exhibit B attached hereto, all of which constitute evidence, fruits, and instrumentalities of violations of Title 21, United States Code, Sections 841(a)(1) and 846 and Title 18, United States Code, Sections 924(c) and 1956, as applicable.

In addition, it is respectfully requested that this Affidavit and each of the arrest warrants and search warrants be filed under seal.

_____
ANTHONY GARIFO
Special Agent
Drug Enforcement Administration


Sworn to before me this
19th day of May, 2007

/s/ E. Thomas Boyle, mj

~~UNITED STATES MAGISTRATE JUDGE~~
EASTERN DISTRICT OF NEW YORK

91

## **EXHIBIT A**

(Definitions of the Subject Premises)

1.  THE PREMISES, CURTILAGE AND OUT BUILDINGS, KNOWN AND DESCRIBED AS 95 SOUTH 24TH STREET, WYANDANCH, NEW YORK, AND ANY CLOSED OR LOCKED CONTAINERS THEREIN ("SUBJECT PREMISES #1");

2.  THE PREMISES, CURTILAGE AND OUT BUILDINGS, KNOWN AND DESCRIBED AS 72 CENTERWOOD STREET, NORTH BABYLON, NEW YORK, AND ANY CLOSED OR LOCKED CONTAINERS THEREIN ("SUBJECT PREMISES #2");

3.  THE PREMISES, CURTILAGE AND OUT BUILDINGS, KNOWN AND DESCRIBED AS 89 NEW AVENUE, WYANDANCH, NEW YORK, AND ANY CLOSED OR LOCKED CONTAINERS THEREIN ("SUBJECT PREMISES #3");

4.  THE PREMISES, CURTILAGE AND OUT BUILDINGS, KNOWN AND DESCRIBED AS 98 N. 18TH STREET, WYANDANCH, NEW YORK, AND ANY CLOSED OR LOCKED CONTAINERS THEREIN ("SUBJECT PREMISES #4");

5.  THE PREMISES, CURTILAGE AND OUT BUILDINGS, KNOWN AND DESCRIBED AS 4 CARRIAGE COURT, DIX HILLS, NEW YORK, AND ANY CLOSED OR LOCKED CONTAINERS THEREIN ("SUBJECT PREMISES #5");

6.  THE PREMISES, CURTILAGE AND OUT BUILDINGS, KNOWN AND DESCRIBED AS 45 BEDFORD AVENUE, WYANDANCH, NEW YORK, AND ANY CLOSED OR LOCKED CONTAINERS THEREIN ("SUBJECT PREMISES #6");

7.  THE PREMISES, CURTILAGE AND OUT BUILDINGS, KNOWN AND DESCRIBED AS 3 BUCHANAN AVENUE, COPAIGUE, NEW YORK, AND ANY CLOSED OR LOCKED CONTAINERS THEREIN ("SUBJECT PREMISES #7");

8.  THE PREMISES, CURTILAGE AND OUT BUILDINGS, KNOWN AND DESCRIBED AS 56 SPRUCE STREET, WYANDANCH, NEW YORK, AND ANY CLOSED OR LOCKED CONTAINERS THEREIN ("SUBJECT PREMISES #8");

9.  THE PREMISES, CURTILAGE AND OUT BUILDINGS, KNOWN AND DESCRIBED AS 105 IRVING AVENUE, WYANDANCH, NEW YORK, AND ANY CLOSED OR LOCKED CONTAINERS THEREIN ("SUBJECT PREMISES #9");

10.  THE PREMISES, CURTILAGE AND OUT BUILDINGS, KNOWN AND DESCRIBED AS 11 LILMAR PLACE, ISLIP TERRACE, NEW YORK, AND ANY CLOSED OR LOCKED CONTAINERS THEREIN ("SUBJECT PREMISES #10"); and

11.  THE PREMISES, CURTILAGE AND OUT BUILDINGS, KNOWN AND DESCRIBED AS 28 JAMAICA AVENUE, WYANDANCH, NEW YORK, AND ANY CLOSED OR LOCKED CONTAINERS THEREIN ("SUBJECT PREMISES #11").

## EXHIBIT B

(Items to Be Seized)

(1) drugs, drug paraphernalia, scales, drug residue, dilutants and materials related to distributing and/or manufacturing drugs;

(2) books and records, showing cash transactions, prices and quantities of drugs bought and sold;

(3) books and records showing the names, addresses and telephone numbers of purchasers and suppliers of drugs, as well as the identities of confederates in drug trafficking;

(4) pagers, electronic organizers, cellular telephones and related bills and receipts;

(5) motor vehicle records, rental vehicle records, telephone bills, property records showing ownership of assets purchased with drug proceeds;

(6) currency used to purchase drugs, or reflecting proceeds of sales of drugs; and

(7) banking and financial records, to include wire transfer receipts, bank deposit and withdrawal slips, and any other document evidencing a financial transaction that was conducted with proceeds;

all of which constitute evidence, fruits and instrumentalities of violations of Title 21, United States Code, Sections 841(a)(1) and 846 and Title 18, United States Code Section 1956; and

(8) firearms, which constitute evidence of violations of Title 18, United States Code, Section 924(c).

The items to be seized include any of the above items that are maintained within other closed or locked containers, including safes and other containers that may be further secured by key locks (or combination locks) of various kinds.

# SEE COURT FILES FOR

# EXHIBIT(S)